**M. Rudolph PREUSS, Trustee in Bankruptcy of Crosby Teletronics Corp., Plaintiff-Appellee,**

v.

**GENERAL ELECTRIC CO., Inc., Defendant-Appellant.**

**No. 174, Docket 31507.**

United States Court of Appeals Second Circuit.

Argued Jan. 2, 1968.

Decided March 14, 1968.

John Hoxie, New York City (William S. Wolfe, Utica, N. Y., Davis, Hoxie, Faithfull & Hapgood, James W. Bock,

Stephen B. Judlowe, New York City, of counsel), for defendant-appellant.

Hugh A. Chapin, New York City (Kenyon & Kenyon, Lloyd McAulay, New York City, of counsel), for plaintiff-appellee.

Before LUMBARD, Chief Judge, and MOORE and FRIENDLY, Circuit Judges.

MOORE, Circuit Judge:

### The Parties

Plaintiff is the trustee in bankruptcy of Crosby Teletronics Corp., the sole owner of the patent at issue. Defendant is General Electric Co., Inc., a New York corporation.

### The Issue

This is an action for infringement of United States Patent No. 2,851,532 issued to Murray Crosby on September 9, 1958 on an application filed with the Patent Office on April 21, 1953. The patent relates to a method of FM stereo radio transmitting and receiving. Plaintiff alleged that General Electric manufactured and sold FM stereo receiving, transmitting, and adapting equipment using devices and methods embodied in Crosby's patented invention. Defendant waived the defense of non-infringement by pre-trial stipulation. Thus, the only defense before the trial court, and now before us, was patent invalidity. The trial court found the patent valid. We reverse on the ground that Crosby's invention would have been obvious at the time of invention to a person of ordinary skill in the radio art. 35 U.S.C. § 103. As the Supreme Court has directed, we focus on several factual inquiries:

" * * * [T]he scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. * * * " Graham v. John Deere Co. of Kansas City, 383 U.S. 1, 17, 86 S.Ct. 684, 694, 15 L.Ed.2d 545 (1966).

*The Patent at Issue*

Stereophonic sound is now familiar to all music listeners. In substance, two microphones record the performance, one from each side of the stage. The music is reproduced through two speakers spaced some distance apart—the left-hand speaker reproducing what has been picked up by the left-hand microphone, the right-hand speaker that which has been picked up by the right-hand microphone. This use of separate left (L) and right (R) channels makes the music produced at any particular point on the concert stage appear to emanate from a corresponding point in the listener's living room, creating a spatial or depth illusion—the live quality of the music.

Crosby taught a technique for full fidelity FM [1] stereo radio which was monophonically compatible. This means that while the listener with the stereo receiver hears the L channel from one speaker and the R channel from the other, the listener with only a monaural (non-stereo) receiver hears a balanced mixture of the two channels—the same sound he would hear if the program were being broadcast monophonically. Without this compatibility, the monaural listener would hear only one channel (either L or R), with its unbalanced emphasis on the music being produced on only one side of the stage.

Crosby achieved this compatibility by the use of a sum-and-difference matrixing, which he believed he had invented.

This method electronically combines (matrixes) the L and R channels in such a way as to produce two new signals, the (L + R) signal and the (L − R) signal. The (L + R) signal is then broadcast in the usual fashion. The (L − R) signal is broadcast over a subcarrier superimposed on the same carrier wave. This is termed "subcarrier" multiplexing.[2] If the receiver is monaural, it only reproduces the (L + R) signal. However, in a stereophonic receiver the (L − R) signal on the subcarrier is also used. The two signals are put through a matrix, providing for the L signal for the left speaker and the R signal for the right speaker.[3]

An advantage of the sum-and-difference matrixing as used by Crosby is that it equalized the signal/noise ratio of the left and right channels. A certain volume of noise is inherent in all radio transmission; this can be particularly distracting where, as in non-matrix stereo systems, different amounts of noise can be heard in the two speakers. Crosby's invention balanced the noise. Furthermore, although it was not initially emphasized, the Crosby patent resulted in complete separation of channels over the full audio range. Only· the L channel would be heard from the left-hand speaker, only the R channel from the other. Other systems, which, to conserve band width, as was certainly necessary in the AM field (e. g., the Boelens patent), restricted the audio range of

---

1. There are two ways to transmit sound by a radio carrier wave. Either the amplitude is modulated (AM) or the frequency is modulated (FM). The technique used often describes the radio system, i. e., AM radio and FM radio. At the time of invention, AM radio offered better prospects for commercial gain than did FM radio. However, by using FM, Crosby was able to transmit the full audio range of 20 to 15,000 cycles per second, thus providing a full fidelity sound. The FCC permitted this broad band transmission on FM; it did not permit it on AM, for it wanted to "stuff" more stations into the available area. Thus, AM radio is not considered to be full fidelity.

2. Our result does not require a more accurate, and necessarily more technical, explanation of "subcarrier" multiplexing. Equally simplified, there are two other ways of sending two or more radio signals over the same carrier wave. The "hybrid" style of multiplexing provides for modulating the amplitude of one signal and the frequency of the other. The "switching" method provides for high speed changing of the two signals on the carrier wave.

3. In the dematrixing process, the two signals are added and subtracted. Algebra dictates that $(L + R) + (L − R) = 2L$ and that $(L + R) − (L − R) = 2R$.

one of the signals, yielded a mixed or monophonic sound over the audio range in which only one channel was broadcast. For example, if (L + R) was broadcast with an audio range of from 0 to 15,000 and if (L − R) was broadcast with an audio range of from only 0 to 5,000, then the channels would be separate from 0–5,000; from 5,000 to 15,000 (L + R) would be heard from both speakers.[4]

### Scope and Content of the Prior Art

█ Implicit in the trial judge's opinion and findings of fact and law is the scope of the prior art—the field of radio communication. In establishing the content of this area, defendant introduced a number of patents. To constitute prior art, they must teach the invention with clarity and explicitness. Technical Tape Corp. v. Minnesota Mining & Mfg. Co., 143 F.Supp. 429, 435–436 (S.D.N.Y. 1956), aff'd 247 F.2d 343 (2 Cir. 1957). We need to discuss only three of the patents offered in evidence. The trial judge found their teachings clear enough for us to rely on them.

The German Patent No. 861,884 to Griese, applied for in 1950 and issued in 1953, taught a "subcarrier" type of multiplexing for FM stereo radio. No matrixing was used, however, and therefore there was no compatibility. By 1953, this "subcarrier" method was standard for transmitting two FM signals over the same radio wave. The

British Patent No. 540,185 issued in 1941 to Standard Telephones & Cables, Ltd. It taught the sum-and-difference matrixing to provide for monophonic compatibility in standard narrow channel AM broadcasting. Since the patent was for the AM field, the band widths were restricted, thereby providing less than full fidelity. However, the audio ranges transmitted over the two channels were equal. A "hybrid" style multiplexing was used. The United States Patent No. 2,698,379, based on a Netherlands parent application filed in 1951, issued to Boelens in 1954. Similar to the Standard Telephones patent, its teachings are more pertinent and comprehensive. Among other things, it taught the same matrix circuitry that would later be used in the Crosby patent. However, as with other AM patents, it restricted the frequency range on the second channel,[5] naturally resulting [see fns. 1, 4 and 8] in less than full fidelity, an unbalanced signal/noise ratio, and incomplete separation of signals.

### Level of Ordinary Skill

35 U.S.C. § 103 provides for a specialized reasonable man test for obviousness. In our case, this reasonable man follows *a fortiori* from the definition of the scope of the prior art; he is the man with ordinary skill in radio communication. Thus, our question: what would have been obvious to a reasonable radio engineer who, among other things, had the

---

4. Crosby, re-direct examination, transcript page 652:

"If it so happened that the frequency response of the (A − B) was not carried out to the same full range as the sum combination (A + B), this algebra just wouldn't work out. * * * [It] would become a combination which would be 2A [on one speaker] up *to a* certain cutoff frequency at where the frequencies fed to the subcarrier * * * were artificially cutoff, * * * so that you would have (A + B) * * * plus (A − B) equals 2A up to this cutoff frequency range, which we might say was * * * five kilocycles, and then for the range from. five to fifteen kilocycles you would have (A + B), which would be a monophonic repro-

duction, because it would be (A + B) in both loud speakers in the range from five kilocycles to fifteen kilocycles, assuming a cutoff frequency of five kilocycles. In other words, this algebra just wouldn't function under those circumstances."

5. Oral Argument on Appeal, Transcript page 7:

Mr. Chapin [Crosby's attorney]: Also, Boelens did not teach the use of substantially full audio frequency. Boelens, as a matter of fact, taught very clearly that you cut off the low 300 cycles per second and you attenuate above something like 4000.

Judge Friendly: Why did he do that?

Mr. Chapin: Because he was trying to narrow the band width.

Griese, Standard Telephones, and Boelens patents in mind when he endeavored to solve the problem of how to achieve monophonic compatibility on FM stereo radio? Formal Fashions, Inc. v. Braiman Bows, Inc., 369 F.2d 536 (2 Cir. 1966).

### Patent Validity

■ The trial judge found the invention nonobvious. We are aware of the dangers of slipping into the use of hindsight and of reading into the prior art the teachings of the invention. Graham v. John Deere Co. of Kansas City, supra at 383 U.S. 36, 86 S.Ct. 684. Nevertheless, the question of patentability is one of law. Graham v. John Deere Co., supra at 17, 86 S.Ct. 684; Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 155, 71 S.Ct. 127, 95 L.Ed. 162 (1940). We have considered the Patent Office's determination, Ling-Temco-Vought, Inc. v. Kollsman Instrument Corp., 372 F.2d 263, 268 (2 Cir. 1967) and the trial judge's conclusion. Nevertheless, we find that the invention would have been evident to an engineer of ordinary skill in the radio field in 1953.

The trial judge placed great emphasis on the secondary, supporting issues. He did not focus on the inventive process so much as the after-the-discovery results and occurrences. He concluded that Crosby's *results* filled a *real need* in the industry. He bolstered this finding by emphasizing the *acclaim* accorded Crosby and the resultant *commercial success* of his invention. Although the issues the trial judge relied on may be appropriate for consideration, Ling-Temco-Vought, Inc. v. Kollsman Instrument Corp., supra

at 269, they are not to carry too heavy a burden. Graham v. John Deere Co. of Kansas City, supra at 383 U.S. 29–30, 36, 86 S.Ct. 684. We place primary reliance on the technical facts of the inventive process; we think that the secondary issues relied on by the trial judge to reach an opposite conclusion either support our determination or are simply inconclusive.

### (I)

Even if the problem which the trial judge thought Crosby had solved—how to achieve monophonically compatible stereo FM radio with full separation over the full audio range—was the problem [see part III] the industry needed solved [see part II], Crosby's combination of known radio features would have been obvious to a skilled radio engineer in 1953. Crosby merely updated and upgraded the presently existing FM stereo system by adding the already developed (although he did not know it) AM sum-and-difference matrixing. Little more was needed.

■ First, however, Crosby's claims of full separation over the entire audio range and a balanced signal/noise ratio, both collateral results, should not be allowed to distract us from the principal aspect of the problem which Crosby was trying to solve—how to achieve compatibility.[6] All agreed that if he solved this problem in the FM field, and if full and equal signals were broadcast over both channels, which would have been probable if there were no FCC restrictions, as in AM, then it was mathematically obvious that there would be full separation over the entire audio range.[7] A balanced sig-

---

6. Mr. Kassens, Transcript of "Evolution of a Hi Fi Broadcast," FM Music Program Guide, 12, 32 (October, 1966):

"I think he [Crosby] did an amazing amount of work to get this thing down the right track. If I am not mistaken it was he who first came up with the idea of matrixing the left and right channel. *This of course made for a compatible system, which was our principal concern.*" (Emphasis added.)

7. Crosby's testimony [see fn. 4] indicates that complete separation over the full audio range is a simple function of having equal frequency ranges on the two channels. If there is no cut-off on one of the channels, the algebra just works out to create full separation. The British Patent to Standard Telephones had equal frequency ranges on both of its channels, although both were restricted ranges so as to comply with AM regulations.

nal/noise ratio also inhered in his solution.[8] If there was, as there was here, an obvious reason for solving the principal feature of a problem, e. g., monophonic compatibility on FM stereo, the doing of it does not become nonobvious because incidental values inhered in the solution. General Electric Co. v. Jewel Incandescent Lamp Co., 326 U.S. 242, 66 S.Ct. 81, 90 L.Ed. 43 (1945). This is surely true if the values had been recognized, but were considered to be incidental.

It is clear that monophonic compatible radio was as desirable in the FM sphere as it was in the AM sphere. There were monaural FM listeners, just as there were monaural AM listeners. Neither wanted an unbalanced sound. It would have been perfectly natural for someone who was aware of the AM sum-and-difference matrixing to plug it into the existing FM stereo system. And although Crosby did not know of the Standard Telephones and the Boelens patents in 1953, this appears to be exactly what he did.

The Griese style of "subcarrier" multiplexing was known to Crosby as the type commonly used on FM stereo in 1953. Crosby changed nothing in it by adding a matrix system. And the matrix Crosby added used circuit designs identical to those used in the Boelens patent. The AM designs required no change to accommodate the wider audio range of the FM world. At trial, Crosby admitted that he had done no more than add the matrix to the FM system.[9] This is classically nonpatentable. An old method was merely " * * * [applied] to a new and closely analogous subject-matter, plainly indicated by the prior art * *." Paramount Publix Corp. v. American Tri-Ergon Corp., 294 U.S. 464, 473, 55 S.Ct. 449, 453, 79 L.Ed. 997 (1935). There was no technology gap in producing monophonically compatible stereo radio; rather, as will be shown, there was a gap of interest and motivation.

## (II)

Prior to the 1950's, there had been some work in stereo radio. The record includes a number of the developments. In 1924, United States Patent No. 1,513,973 was issued to Doolittle. It taught stereophonic broadcasting using two separate radio channels. In 1937, a patent issued to Electric and Musical Industries, Limited. It discussed the possible use of the sum-and-difference technique of a single channel. The British Patent to Standard Telephones issued in 1941. And in 1943, the parent application of the Weyers patent issued in the Netherlands. On a practical level, as early as 1933, Leopold Stokowski transmitted a concert from Philadelphia to Washington in stereo.

Against this background, and an additional flurry of professional activity in the early 1950's, Crosby applied for his patent. In 1958 it issued. However, it

---

8. Feldman [plaintiff's expert], cross-examination, transcript pages 1024–25:
   Q. And is it fair to say as a layman's expression of this that in the course of unscrambling the sum and difference signals, you scramble the noise of the two channels? A. That's a very good way of putting it, yes. You scramble it or in some way average out, I prefer to use that term.
   Q. Am I correct in understanding that in these sum and difference systems where that takes place the effect on the two channels that have different efficiencies with respect to noise is that the better channel gets degraded somewhat in the course of being equalized with the poorer channel? A. That's correct.

9. Crosby on Cross-Examination, Transcript page 372:
   Q. And am I correct in saying that as you knew the art at the time, the prior knowledge, you simply took the going FM multiplex system and added at the transmitter this matrix to accomplish the addition and subtraction, and that you added at the receiver the matrix for doing the addition operation and the subtraction operation that yield A and B separately? A. Yes.

was not until 1961 that the FCC approved FM stereo broadcasting on a commercial scale. And then the FCC adopted the Zenith-General Electric 4–4–a system rather than Crosby's. *Inter alia,* the 4–4–a not only achieved compatible, full fidelity FM stereo, but, unlike Crosby's, it also conserved sufficient space to permit stations to broadcast a profitable SCA (e. g., uninterrupted background music service) subcarrier along with a stereo program.

The trial judge found that this history indicated a "desire" for FM stereo. He then drew the inference that since Crosby satisfied the desire, the invention must have been nonobvious. As he said: "He [Crosby] was confronted with the same obstacles and problems of FM stereo as were others devoted to the art. However, his ingenuity and efforts solved the problem." We find that the record does not support this inference. Many researchers had simply ignored the field.

In the first place, the FCC regulates the radio communication industry. Without its approval, no radio system can be profitable. For example, FM stereo was not approved until eight years after Crosby disclosed his invention. There was therefore little incentive for researchers to devote their laboratories to this area of uncertain return. In the second place, public interest did not become apparent until the mid-1950's. The development of the stereo disc in 1957 was the catalyst for this interest. And as a result, some large radio producers increased their research efforts in the area of FM stereo. For example, it was in 1957 that General Electric first evinced concern for the new area.

■ Thus, although there might have been a professional desire for FM stereo radio in 1953, neither the FCC nor the public had been sufficiently excited so as to generate an active interest in some of the larger research laboratories. Crosby ventured forth almost alone; as he said, " * * * [others] got in the act after I had sort of drawn their atten-

tion to the use of multiplex for stereo." Transcript of "Evolution of a Hi Fi Broadcast," FM Music Program Guide, 12, 32 (October, 1966). Crosby did not fill an existing need, for there was none, with his invention; rather, after inventing the system, he sought to promote a need for it. He had to sell his product to the FCC and then to the public. It is to his credit that he would work in an area of such uncertain profit, United States v. Adams, 383 U.S. 39, 52, 86 S.Ct. 708, 15 L.Ed.2d 572 (1966), but such a fact does not support the conclusion that he filled a need in the industry from which to draw an inference that his invention must have been nonobvious.

(III)

Moreover, even if some inference as to nonobviousness could be drawn from the history of the industry, the evidence does not support the contention that the "insoluble" problem facing the professionals was how to achieve compatible FM stereo with full separation. All agreed that full separation follows naturally if equal frequency ranges are maintained on both channels. It is a mathematical fact, and it was obviously desirable *if* nothing else had to be sacrificed. However, to achieve full separation, other things would have to be given up. For example, it was evident that if equal audio ranges were to be broadcast over both channels, the cost of the radio would be higher than if one channel had a restricted signal. The principal "insoluble" problem was how to achieve monophonic compatibility and still keep the band widths narrow enough to accommodate other FM services, such as SCA. For instance, Weyers, who was issued United States Patent No. 2,515,619 in 1950, was principally concerned with conserving band width; he therefore cut off the frequency range on the second channel, thereby losing the advantage of full separation. As counsel admitted in oral argument, most of those involved in this type of research were principally concerned with the problem of narrow band

width.[10]   Crosby ignored this aspect of the problem altogether.

In finding the problem to be solved that of monophonic compatibility and full separation, the trial judge relied on the fact that the FCC rejected other systems which did not provide for this full separation.   However, the FCC also rejected Crosby's system, for it did not leave band width space for the SCA broadcasts.   The 4–4–a system, which provided both, was chosen.

■   Support for our conclusion that Crosby solved only a truncated problem is found in the fact that Crosby never emphasized full separation in his patent. In 1957 he amended his claim to distinguish it from the Boelens patent by asserting that his system offered full frequency over both channels.   There was no emphasis on equality between the channels, and this is the key to full separation.   Thus, there is the inference that Crosby too viewed full separation not as a solution to a problem, but rather as a value incidental to his principal solution of compatibility.   The belated emphasis on this feature of his combination indicates that it is merely an afterthought.   Graham v. John Deere Co. of Kansas City, supra at 383 U.S. 25, 86 S.Ct. 684.   Plaintiff has defined the problem facing the industry by the solution invented.   No inference of his in-

genuity in solving the complete problem is supportable.

(IV)

■   Admittedly, there was considerable professional excitement over Crosby's invention.   The radio industry acclaimed his discovery.   But this was because he was the first to make the addition he did, not because his invention was nonobvious at the time.   Moreover, for every speech and audience, there must be a speaker.   And in this case, part of the enthusiasm was generated by the inventor.[11]   To make his invention commercially profitable, Crosby had to convince the public and the FCC that it was desirable.   Therefore, as Crosby admitted, he promoted his product.   Transcript of "Evolution of a Hi Fi Broadcast," supra at 32.   Under such circumstances, the trial judge relied too heavily on this after-the-discovery acclaim to support the inference of nonobviousness at the time of invention.

(V)

■   The evidence is conflicting as to commercial success.   For example, although thirty companies took licenses from Crosby, many of them were small. It is possible that they acquiesced merely to avoid the problems, and cost, of fighting a law suit.   A number of very large companies did not take licenses.   However, even if there were conclusive evi-

---

10.  Oral Argument on Appeal, Transcript page 57:

Judge Friendly:  I want to be sure I have your full point as to the importance of recommending this full frequency on the subcarrier.  Why was it that people had not been doing that at least on FM?

Mr. Chapin:  Again, your honor, this was a matter of band widths.

Judge Friendly:  Even in FM?

Mr. Chapin:  Yes.  They were trying to save room for some of those ancillary services, and * * *.

11.  Crosby, Cross-Examination, Transcript page 543:

Q.  Now, may I turn to another subject, Mr. Crosby.  I recall to you, without attempting how to summarize it at all, your testimony concerning various

talks which you gave in the period from 1953 to the late 1950's to various groups, and your testimony in relating to that concerning the publication of two papers which are exhibits.

Now, in relation to that period and to that general subject, could you agree that you were at that time deliberately attempting to promote interest in your particular stereo FM system as it was described in the two papers which you delivered at meetings?  A.  Well, in the beginning it was merely the presentation of an engineering paper in a manner that I have done on many occasions, and have written many articles in the technical journals.  But as time went on, it became a promotion whether I liked it or not, because of the opposition that appeared."

dence of commercial success, nothing more can be concluded than that Crosby's invention has proven useful and saleable. We cannot here draw the inference of nonobviousness. Graham v. John Deere Co. of Kansas City, supra at 36, 86 S.Ct. 684.

Reversed.