George **LERNER** and Julius Ellman, Plaintiffs,

v.

**CHILD GUIDANCE PRODUCTS, INC., and Questor Corporation, Defendants.**

**No. 73 Civ. 2006 (WCC).**

United States District Court, S. D. New York.

Dec. 24, 1975.

Paul J. Sutton, New York City, for plaintiffs.

Hays, St. John, Abramson & Heilbron, New York City, Russell & Nields, Boston, Mass., for defendants; Elias Messing, New York City, Robert B. Russell, Boston, Mass., Donald R. Bahr, Toledo, Ohio, and Elmer J. Gorn, Boston, Mass., of counsel.

## OPINION AND ORDER

CONNER, District Judge:

*The parties and issues*

This is an action for alleged infringement of U.S. Patent No. 2,873,639 which was issued on February 17, 1959 to Clair O. Musser for a toy piano.

The patent was assigned to and is owned by plaintiffs George Lerner and Julius Ellman, who are residents of the New York City area associated in the business of designing and developing toys and licensing others to manufacture them on a royalty basis.

Defendant Child Guidance Products (Child Guidance) is a division of defendant Questor Corporation engaged in the manufacture and sale of toys and educational devices and having a principal place of business in this District.

This Court has jurisdiction of the subject matter of the action under 28 U.S.C. § 1338(a). Personal jurisdiction of defendants and proper venue are conceded.

Plaintiffs charge infringement of Claims 1, 2, 3, 7, 8 and 9 of the Musser patent in suit by three models of toy pianos manufactured in the Orient and sold by Child Guidance in this country: the "Big Mouth Singers" (Exhibit 4) and two models of the "Melody Bell-O-Phone" (Exhibits 5 and 5A).

*The proceedings*

Before trial defendants moved for a summary judgment that none of the accused devices infringes the patent. On August 28, 1975, the Court filed its memorandum denying the motion, in which the Court ruled that, although each of the two independent Claims 1 and 7 of the patent contains five elements which are not literally readable on the accused structures, there is no file wrapper estoppel which would prevent an interpretation of these elements, pursuant to the doctrine of equivalents, sufficiently broad to cover the accused structures, and that this question of equivalency is a disputed issue of material fact which precludes summary disposition. However, the Court added that "there appears to be sufficient doubt concerning such equivalency to warrant a separate trial limited to this one issue." Such separation of the issues is possible and appropriate because the patent in suit expires in only a few months, *i. e.* on February 17, 1976, so that public policy does not require a determination of the issue of validity which is unnecessary to the disposition of the present controversy. *Cf. Sinclair & Carroll Co. v. Interchemical Corp.,* 325 U.S. 327, 330, 65 S.Ct. 1143, 89 L.Ed. 1644 (1945).

Plaintiffs had duly demanded a jury trial, but neither side objected to the Court's suggestion of dividing the trial into two parts, the first confined to the issue of infringement and the second directed to the issue of validity, the second part to commence immediately following the jury's verdict on the first.

At the commencement of the trial, it was stipulated that Claim 1 of the patent was typical of the claims in suit and that the parties would stand or fall on the final determination of its infringement and validity. It was further stipulated that all of the portions of Claim 1 save the five elements referred to previously were literally applicable to all three accused models of defendants' pianos, and that these five were not, so that the jury need consider only the issue whether or not the accused devices incorporate structures which are "equivalents" of the five elements in question—*i. e.*, which "do the same work in substantially the same way, and accomplish substantially the same result * * * ." *Graver Tank & Mfg. Co., Inc. v. Linde Air Products Co.*, 339 U.S. 605, 608, 70 S.Ct. 854, 856, 94 L.Ed. 1097 (1950).

At the conclusion of the first phase of the trial, following summations of counsel and instructions from the Court, the jury returned a special verdict that each of the three of defendants' accused devices incorporates equivalents of all five of the disputed claim elements, so that Claim 1 (and accordingly Claims 2, 3, 7, 8 and 9) of the patent are infringed.

The trial accordingly proceeded to the validity phase, which required only one-half day of court time for the introduction of additional evidence.

At the conclusion of this second phase, defendants moved for a directed verdict of dismissal. In the discussion that ensued, the Court asked counsel for both parties whether there was any disputed issue of fact which was material to the determination of validity according to the procedure decreed by *Graham v. John Deere Co.*, 383 U.S. 1, 17–18, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966), and whether there was any testimonial or other non-documentary evidence which required evaluation by the jury in resolving such factual issues. When both counsel answered both questions in the negative, the Court then inquired whether, under the circumstances, both sides were agreeable to the Court's discharging the jury and determining the issue of validity as a matter of law; see *Julie Research Laboratories, Inc. v. Guildline Instruments, Inc.*, 501 F.2d 1131, 1136 (2d Cir. 1974). Both parties agreed, and further agreed to waive summations and post-trial briefs and to let the Court decide the matter on the basis of the trial record and the papers already on file.

This opinion incorporates the Court's findings and conclusions pursuant to Rule 52(a), F.R.Civ.P.

*The patented invention*

The toy piano of the patent produces what is known in the trade as a "carillon" sound, and which is created by rapid repetitive striking of a chime or tone element to produce a so-called "continuous" tone, which is really a rapid series of identical percussive tones, similar to the ringing of a telephone or doorbell.

Claim 1, which is set forth in full in the margin,[1] describes a toy piano in which the principal features of the assertedly novel combination are:

1. Claim 1 reads as follows:

"1. A toy musical instrument of the class described which includes: a housing having a front side formed with an elongated slot located therein; a *key support* ledge attached to said front side of said housing so as to project generally parallel to said slot; a plurality of projections capable of serving as fulcrums mounted on said housing adjacent to said slot so as to project upwards from the lower edge

thereof; a support member positioned within said housing so as to project generally parallel to said slot; a plurality of keys, each having a top and a bottom and a recess located in the bottom thereof positioned so as to project through said slot into said housing with each of said recesses receiving one of said projections, said keys being supported in a normal position by said projections and said support member located within said housing, said keys

(1) the keys extend through an elongated slot in the front of the piano, and are pivotally supported on projections extending upwardly from the lower edge of the slot into recesses in the underside of the keys to prevent lateral displacement of the keys;

(2) a key support ledge extends parallel to the slot to engage the underside of the keys at their outer ends when the keys are depressed, to limit their range of pivotal movement;

(3) the tone bars are mounted directly on the keys at the upper side of their inner end portions; and

(4) a rotary striker assembly is positioned above the inner end portions of the keys, so as to strike the tone bars when they are moved into playing position by depressing the keys against the support ledge.

The dependent claims 2 and 3, which are also set forth in full in the margin,[2] describe the details of the striker assembly: a horizontal rotary shaft (which is driven by a tiny battery-powered electric motor), a series of arms extending radially from the shaft, with a diametrically opposed pair of these arms aligned with each of the keys, and a washer loosely supported at the end of each arm. As the shaft rotates, the washers are normally urged outwardly by centrifugal force, but yield inwardly as they strike the tone bars. This arrangement provides for striking the tone bars without prolonged pressure against them which would damp their vibration and possibly even impede rotation of the shaft.

Claims 8 and 9 are identical with Claims 2 and 3, respectively, except that

they are dependent on Claim 7, instead of Claim 1. Claim 7 is similar to Claim 1 except for a more detailed description of the resilient means for supporting the tone bars on the keys. No novelty is asserted for the support means *per se*.

*The presumption of validity*

As in all patent infringement actions, we begin with the presumption that the Musser patent in suit is valid, with the defendants having the burden of establishing its invalidity. 35 U.S.C. § 282.

■ The strength of this presumption depends, of course, on whether the Patent Office had before it at the time it granted the patent the most relevant prior art. If it did, the presumption is reinforced. *Ling-Temco-Vought, Inc. v. Kollsman Instrument Corporation,* 372 F.2d 263, 268 (2d Cir. 1967). If it did not, the presumption is weakened or negated altogether. *Julie Research Laboratories, Inc. v. Guildline Instruments, Inc., supra,* 501 F.2d at 1136; *Lorenz v. F. W. Woolworth Co.,* 305 F.2d 102, 105, n. 7 (2d Cir. 1962).

■ Here, as will be seen, the two most pertinent patents relied on by defendants had been cited and considered by the Patent Examiner, but a third patent, showing a feature whose significance the patentee's attorney emphasized during prosecution of the patent application, was not cited, nor was there any other reference disclosing this feature. The presumption is therefore probably entitled to little if any weight in this case. But, in any event, the presumption means no more than that reasonable doubts will be resolved in favor of the

being capable of being engaged on the outside of said housing so as to be pushed into engagement with said key support ledge so as to rotate said keys about said projections to a playing position; a tone bar resiliently attached to each of said keys so as to be moved to a playing position when said keys are moved to a playing position; a shaft rotatably mounted within said housing above said tone bars, said shaft being generally parallel to said slot; means operatively associated with said shaft and mounted in said housing for rotating said shaft; a plurality of arms attached to said

shaft so as to project therefrom, each of said arms being located generally above one of said tone bars; means *operatively associated with* each of said arms for periodically striking one of said tone bars when said keys are actuated so as to rotate about said projections to a playing position" (emphasis added).

2. Claims 2 and 3 read as follows:

2. A toy musical instrument as defined in claim 1 wherein said arms project radially from said shaft and wherein said arms are spaced about said shaft so as to project from said shaft in different directions.

patentee. *Reeves Bros. Inc. v. U. S. Laminating Corp.*, 417 F.2d 869, 872 (2d Cir. 1969). The presumption need not be "accorded the weight of actual evidence" nor "affect a decision of invalidity that would otherwise be reached with confidence." *Lorenz v. F. W. Woolworth Co., supra,* 305 F.2d at 105.

## The evidence of invalidity

Defendants have attacked the validity of the patent on the sole ground that the patented invention would have been obvious at the time it was made to a person having ordinary skill in the art to which it pertains. 35 U.S.C. § 103.

In determining this issue of obviousness we must begin with the "background" considerations prescribed by *Graham v. John Deere Co., supra*:

"Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined." 383 U.S. at 17, 86 S.Ct. at 694.

■ The evidence which defendants introduced to show obviousness is essentially documentary, consisting principally of a book of twenty prior patents (Defendants' Exhibit B). Defendants also adduced the testimony of a doctor of mechanical engineering explaining the construction and operation of the devices disclosed in these patents, but this testimony was based only on his reading of the patents themselves and, while it doubtless would have been of considerable assistance to the jury in perceiving the relationship between the prior art and the invention at issue, it is wholly unnecessary to the Court's understanding of the extremely simple mechanical structures involved. Defendants also introduced the testimony of the Director of Product Development of Child Guidance to the effect that, in view of the prior patents, the claimed invention would have been obvious to a person having ordinary skill in the art. However, that testimony, even though uncontradicted, is of little weight, since it is opinion testimony of an interested witness on the ultimate issue before the Court—an issue of *law*, after the underlying facts have been established. *Julie Research Laboratories, Inc. v. Guildline Instruments, Inc., supra.*

## The prior art

There are only three of the prior patents which need be considered here, since these three disclose all of the elements of the claimed invention which are shown by any of the others, and the cumulation of the others merely serves to show the crowded state of the art.

## I. Marks U.S. patent 2,052,890 (1936)

The Marks patent (Tab 9 in DX B), which was cited by the Patent Office, discloses a toy piano incorporating all of the structure described in Claim 1 which relates to the method of supporting the keys and limiting their pivotal movement. The keys 31 (Fig. 2) extend through an elongated slot in the front 21 of the piano and, in the embodiment of Figures 7 and 8, are supported for pivotal movement on projections 66 which extend upwardly from the lower edge of the slot into recesses 68 in the underside of the keys 67. A key support ledge 24 (Fig. 2) engages the underside of keys at their outer ends to limit pivotal movement of the keys.

Depressing the keys 31 against the ledge 24 causes hammers 41 at the ends of pivotally mounted arms 40 to be thrown upwardly to strike tone bars 34

---

3. A toy musical instrument as defined in claim 1 including a projection attached to each of said arms at an extremity remote therefrom, each of said projections having an enlarged end thereon; and wherein each of said means attached to said arms comprises a ring positioned on one of said projections, said rings being held on said projections by said enlarged ends and being capable of rotation about said projections.

resiliently mounted above the respective keys.

### K. Bassler Belgian patent 515,147 (1952)

This Belgian patent (Tab 20 in DX B), which was not cited by the Patent Office, shows a stringless, keyboard-operated musical instrument in which the tone bars are mounted directly on the keys, as exemplified by the structure of Fig. 20 in which the bar 70 is mounted on the inner end of the key 1. During prosecution of the application for the patent in suit, this feature was emphasized by Musser's attorney as making it possible for the piano to be assembled merely by dropping the keys into place (file wrapper DX A, pp. 29–30, 42–43).

### A. Bienengraber German patent 567,- 657 (1931)

This German patent (Tab 19 in DX B), which was cited by the Patent Office, discloses a piano-type musical instrument which produces a carillon sound by means of sound-generating elements identical with those described in the patent claims in suit.

A horizontal rotary shaft $C$ (Abb. 1) carries diametrically opposed rods $e$ which loosely support washer-shaped hammers $d$ which repetitively strike tone bars $f$ when they are moved into playing position by depressing keys $g$ on a keyboard into engagement with stops positioned beneath the keys.

### The differences between the patented invention and the prior art

It is readily apparent that the complete combination described in the patent claims could be produced by modifying the toy piano of Marks only to the extent of substituting for its key-actuated hammers and fixed tone bars Bienengraber's key-actuated tone bars and rotary striker assembly. The simplest method of supporting the tone bars would of course be to mount them directly on the inner ends of the keys as taught by Bassler.

### The obviousness of the differences

In determining the issue of obviousness we must assume that the patentee Musser was aware of all of this prior art when he made the invention. *David & David, Inc. v. Myerson,* 388 F.2d 292, 294 (2d Cir. 1968).

The conclusion seems inescapable that with Marks, Bienengraber and Bassler before him, any toy designer of ordinary skill could devise a toy piano which would produce carillon sounds. However, as I have observed before, this does not necessarily mean that the patented invention is obvious, for it assumes that the designer has started with the specific task of developing a toy piano capable of producing carillon sounds, whereas patentable ingenuity may and often does reside in the perception of a desirable goal which, once perceived, is achievable through the exercise of only routine skill. *Timely Products Corp. v. Arron,* 523 F.2d 288 (2d Cir. 1975); *Plantronics, Inc. v. Roanwell Corp.,* 403 F.Supp. 138 (S.D.N.Y.1975).

However, I do not believe that any skill beyond that of the average toy designer was involved in conceiving the objective of a toy piano producing carillon sounds, because Bienengraber's full-sized musical instrument producing such sounds was on the market, and the patentee Musser had actually seen one in Dusseldorf.

Moreover, as discussed hereinafter, Dr. Musser was not the only toy designer who visualized the desirability of a *toy* piano producing carillon sounds.

### The secondary considerations or "signposts"

As virtually always, our final determination turns upon the "secondary considerations" referred to in *Graham*—the history of the art before and after the invention:

> "Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin

of the subject matter sought to be patented. As indicia of obviousness or nonobviousness, these inquiries may have relevancy." 383 U.S. at 17–18, 86 S.Ct. at 694.

These are what Judge Learned Hand called the "signposts" of patentability and properly deemed infinitely more reliable than *a priori* evaluations aided by hindsight. *Reiner v. I. Leon Co.,* 285 F.2d 501, 504 (2d Cir. 1960), *cert. denied,* 366 U.S. 929, 81 S.Ct. 1649, 6 L.Ed.2d 388 (1961).

However, there are few "signposts" to guide our present journey.

The only evidence that plaintiffs introduced which tended to show that the invention was not obvious was that of commercial success: Dr. Musser testified on deposition that several hundred thousand of his "Bell Organ" toy pianos had been sold and that they had been played on television shows and even on the stage at the Radio City Music Hall, where a chorus of Rockettes played them in unison.

■ While commercial success is indeed a makeweight for patentability, it cannot tip the balance where the obviousness of the invention is clear. *Timely Products Corp. v. Arron, supra,* 523 F.2d 288 and cases cited therein.

But plaintiffs quite unwittingly introduced some "secondary" evidence strongly tending to show the obviousness of the invention. Plaintiff Julius Ellman testified that, about 1971, he and his associate, plaintiff George Lerner, independently developed a toy piano called the "Jolly Jingle Tone" which produced a carillon sound. It was strikingly similar in construction to that of the Musser patent, likewise having tone bars mounted on the inner ends of the keys for movement into engagement with a striker assembly including a horizontal rotary shaft having radial arms with loosely mounted washers at their ends. Plaintiffs took a prototype of this device to Ideal Toy Co. for the purpose of attempting to interest them in a license to manufacture it. Ideal's Director of Research and Development, Julius Cooper,

expressed enthusiasm about it, but after a patent search turned up the Musser patent, Ideal lost interest. Undaunted, plaintiffs located Dr. Musser, acquired an option on his patent, and eventually purchased it outright for $1,000. Thus armed, they went back to Ideal, but Ideal had in the meantime learned of the similar Child Guidance toy pianos which were then being sold and declined to enter a "diluted" market pre-empted by competition.

■ It thus appears that, at roughly the same time the claimed invention was conceived by the patentee, Dr. Musser, it was developed by at least one other team, plaintiffs Lerner and Ellman, and, since there was no evidence of derivation by Child Guidance from either Musser or plaintiffs, perhaps by a third team as well. Such generally contemporaneous independent development is at least some evidence that the invention was not beyond the reach of those of ordinary skill in the art. *Felburn v. New York Central Railroad Co.,* 350 F.2d 416, 426 (6th Cir. 1965), *cert. denied,* 383 U.S. 935, 86 S.Ct. 1063, 15 L.Ed.2d 852 (1966).

Moreover, the nominal price tag which Dr. Musser placed on the patent does not bespeak a high esteem for the mercantile value of the invention.

On balance, the "secondary considerations" as a whole tend to demonstrate more the obviousness of the invention than its patentability. This evidence thus serves only to confirm our initial "hindsight" appraisal of the invention in light of the prior art.

Finally, it should be noted that, in its application of the doctrine of equivalents so as to find the claims in suit infringed by the accused Child Guidance devices, the jury broadened the wording of the claims in several respects:

1) the claims were not limited so as to require that the tone bars be mounted directly on the keys, but were found sufficiently broad to cover a more complex arrangement, such as that of the two "Melody Bell-O-Phone" devices in which push buttons projecting upwardly through openings in the keyboard en-

gage the outer ends of the pivotally mounted levers on which the tone bars are supported;

2) the claims were interpreted so as not to require a continuous key support ledge at the front of the keyboard for limiting movement of the keys and to cover separate stops in various locations.[3]

██ The claims must, of course, be given the same breadth of interpretation for purposes of determining their validity as they were given in determining their infringement. *Fife Mfg. Co. v. Stanford Engineering Co.,* 299 F.2d 223, 226 (7th Cir. 1962).

Bienengraber literally anticipates every element and feature of the structure described in the claims, except for their recitation that the tone bars are supported on the keys and that the movement of the keys is limited by a key support ledge extending across the front of the piano. But these were two of the very limitations which the jury had to disregard in order to find the patent infringed.

Thus the claims need be interpreted only slightly more broadly than they were interpreted in finding infringement, in order for them to read fully on the disclosure of Bienengraber. Bienengraber has a key linkage with three relatively movable parts instead of one as disclosed in the Musser patent and two as employed in the "Melody Bell-O-Phone."

For all these reasons, I conclude that the invention covered by Claims 1, 2, 3, 7, 8 and 9 of the Musser patent in suit was obvious at the time it was made to persons of ordinary skill in the art, and that these claims are therefore invalid under 35 U.S.C. § 103.

The Complaint is dismissed.

So ordered.

---

**3.** The jury also interpreted the claims so as not to require a single elongated opening in the front of the piano through which all the keys extend (in the accused Child Guidance devices the keys extend through separate openings), and so as not to require projections extending upwardly from the lower edge of the opening (in the Child Guidance devices the keys are pivotally mounted on a horizontal rod which is straddled by fingers at the lower edges of the keys, the fingers resiliently snapping around the rod when the keys are pushed down onto the rod during assembly). However, since the prior Katz patent shows the precise key-supporting arrangement disclosed in the claims, it is unnecessary to broaden the claims in these respects in order for them to read literally on the prior art. In these respects the claims read on the prior art more readily than on the accused devices.