**BURNDY CORPORATION, Plaintiff,**

v.

**KEARNEY–NATIONAL, INC.,**
**Defendant.**

**No. 75 Civ. 3248 (VLB).**

United States District Court,
S. D. New York.

Jan. 2, 1979.

Hopgood, Calimafde, Kalil, Blaustein & Lieberman, New York City, for plaintiff.

Paul M. Denk, St. Louis, Mo., Brumbaugh, Graves, Donohue & Raymond, New York City, for defendant.

OPINION

BRODERICK, District Judge.

I.

*Introduction*

This is a declaratory judgment action. The subject matter of the action is a patent ("the Zemels patent") that has been assigned to defendant, Kearney National, Inc. ("Kearney"). The Zemels patent covers items known as "compression connectors." [1]

Plaintiff, Burndy Corporation ("Burndy"), seeks a judgment declaring that the Zemels patent is invalid and that the manufacture, use, or sale by Burndy or its privies of compression connectors made and sold by Burndy does not constitute an infringement of any valid claim of the Zemels patent or an infringement of any other rights of Kearney. Burndy also seeks an injunction restraining Kearney and Kearney's privies from asserting infringement, and from bringing or threatening any infringement actions against Burndy and its privies based on the Zemels patent or any other patent under which defendant now has the power to assert a claim of infringement. Burndy also seeks attorneys' fees.

Kearney asserts the validity of the Zemels patent and, by counterclaim, seeks an injunction restraining Burndy from infringing the patent; compensatory damages for Burndy's alleged past infringements of the patent; and attorneys' fees.

---

1. Compression connectors will be discussed in detail *infra*.

Burndy is incorporated in the State of New York, and Kearney, incorporated in Delaware, has a place of business in New York City. Both companies are engaged in the manufacture and sale of electrical products, including electrical compression connectors.

Burndy bases its claims in this action on 35 U.S.C. §§ 101, 102, 103, 112, and 285.[2]

2. 35 U.S.C. § 101 provides:

§ 101. Inventions patentable

Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title. July 19, 1952, c. 950, § 1, 66 Stat. 797.

35 U.S.C. § 102 provides:

§ 102. Conditions for patentability; novelty and loss of right to patent

A person shall be entitled to a patent unless—

(a) the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent, or

(b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States, or

(c) he has abandoned the invention, or

(d) the invention was first patented or caused to be patented, or was the subject of an inventor's certificate, by the applicant or his legal representatives or assigns in a foreign country prior to the date of the application for patent in this country on an application for patent or inventor's certificate filed more than twelve months before the filing of the application in the United States, or

(e) the invention was described in a patent granted on an application for patent by another filed in the United States before the invention thereof by the applicant for patent, or on an international application by another who has fulfilled the requirements of paragraphs (1), (2), and (4) of section 371(c) of this title before the invention thereof by the applicant for patent, or

(f) he did not himself invent the subject matter sought to be patented, or

(g) before the applicant's invention thereof the invention was made in this country by another who had not abandoned, suppressed, or concealed it. In determining priority of invention there shall be considered not only the respective dates of conception and reduction to practice of the invention, but also the reasonable diligence of one who was first to conceive and last to reduce to practice, from a time prior to conception by the other. July 19, 1952, c. 950, § 1, 66 Stat. 797.

35 U.S.C. § 103 provides:

§ 103. Conditions for patentability; non-obvious subject matter.

A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made. July 19, 1952, c. 950, § 1, 66 Stat. 798.

35 U.S.C. § 112 provides:

§ 112. Specification

The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention.

The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention.

A claim may be written in independent or, if the nature of the case admits, in dependent or multiple dependent form.

Subject to the following paragraph, a claim in dependent form shall contain a reference to a claim previously set forth and then specify a further limitation of the subject matter claimed. A claim in dependent form shall be construed to incorporate by reference all the limitations of the claim to which it refers.

A claim in multiple dependent form shall contain a reference, in the alternative only, to more than one claim previously set forth and then specify a further limitation of the subject matter claimed. A multiple dependent claim shall not serve as a basis for any other multiple dependent claim. A multiple dependent claim shall be construed to incorporate by reference all the limitations of the particular claim in relation to which it is being considered.

An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specifica-

Kearney bases its claims on 35 U.S.C. § 271.[3]

This court has personal jurisdiction of the parties. Subject matter jurisdiction is based on 28 U.S.C. §§ 1338, 2201, and 2202. Venue is proper under 28 U.S.C. § 1391(c).

A bench trial was had herein. This opinion contains my findings of fact and conclusions of law pursuant to Rule 52(a), Fed.R. Civ.P.

## II.

*Conclusion*

Burndy advances several arguments in support of its contention that the Zemels patent is invalid,[4] but principally relies on the argument under 35 U.S.C. § 103 that the patent is invalid on the grounds of obviousness.[5]

For the reasons stated below, I find that the Zemels patent is invalid on the grounds of obviousness. 35 U.S.C. § 103. Therefore, Burndy is entitled to the declaratory judgment and injunction sought herein.[6]

Because I agree that the Zemels patent is invalid under Section 103, and because this conclusion is dispositive, I do not reach Burndy's other arguments.[7]

I find that this is not an "exceptional" case within the meaning of 35 U.S.C. § 285 and conclude that Burndy is not entitled to attorneys' fees.

## III.

*Background and Development of the Zemels Patent*

The Zemels patent,[8] originally issued to Carl G. Zemels, pertains to an electrical compression connector that is made of dead-soft aluminum and is formed in the shape of an "H". The compression connector is generally used in overhead installations, and its purpose is to connect a power-carrying conductor (called a "line conductor") to a "tap conductor" that carries the electrical power from the line conductor into a particular building. Thus power may be tapped from a line conductor and transferred, via a tap conductor, into the building of an electrical power consumer.

The electrical compression connector covered by the Zemels patent is known as an H-frame connector. The connector has a pair of upper arms (called "lips" in the patent) and a pair of lower arms (also called "lips" in the patent). Each pair of arms defines a space, which space is termed a "socket" in the patent. The H-frame con-

---

tion and equivalents thereof. As amended July 24, 1965, Pub.L. 89–83, § 9, 79 Stat. 261; Nov. 14, 1975, Pub.L. 94–131, § 7, 89 Stat. 691.
35 U.S.C. § 285 provides:
§ 285. Attorney fees
The court in exceptional cases may award reasonable attorney fees to the prevailing party. July 19, 1952, c. 950, § 1, 66 Stat. 813.

3. 35 U.S.C. § 271(a) and (b) provide:
§ 271. Infringement of patent
(a) Except as otherwise provided in this title, whoever without authority makes, uses or sells any patented invention, within the United States during the term of the patent therefor, infringes the patent.
(b) Whoever actively induces infringement of a patent shall be liable as an infringer.

4. Burndy concedes that its compression connectors infringe at least claim 1 of the Zemels patent. Trial Transcript ("Tr.") at 14. Therefore, if Burndy failed to establish that the Zemels patent is invalid under any of the statutory sections cited, *see supra* n. 2, Burndy would be liable for infringement. Because of this fact, I

find it unnecessary in this case to follow "the approved procedure of deciding the question of alleged infringement." *Ling-Temco-Vought, Inc. v. Kollsman Instrument Corp.,* 372 F.2d 263, 265 (2d Cir. 1967).

5. *See supra* n. 2.

6. The injunction to be issued herein will not restrain Kearney and its privies from seeking to enforce patents other than the Zemels patent against Burndy. The issue of the validity of such other patents is not before me, and in this action I decide nothing about their validity.

7. Burndy has also argued that the Zemels patent is invalid for lack of utility, 35 U.S.C. § 101; for anticipation, 35 U.S.C. § 102; and for lack of specificity, 35 U.S.C. § 112.

8. U.S. Patent No. 3,322,888. The six drawings that Zemels submitted with his patent application are appended to this Opinion as Appendix A.

nector thus has an upper socket and a lower socket. The upper socket generally is larger than the lower socket, and the upper socket is used to hold the line conductor while the lower socket is used to hold the tap conductor.

The process of installing an H-frame connector proceeds roughly as follows. A lip of the lower socket and a lip of the upper socket each has an extension or "tab." (See Numbers 11 and 12 of Figures 1, 2, 3, 5, Appendix A). These tabs, which are made of a weaker metal than the metal that composes the rest of the connector, are designed to be bent over into each socket by the finger of a lineman. Thus, the lineman takes the connector to the conductor; places the line conductor in the upper socket; and bends the tab into the socket over the line conductor so that the line conductor is at least loosely secured in the upper socket. The lineman then places the tap conductor into the lower socket of the H-frame connector and bends the tab of that socket over the tap conductor so that the tap conductor is at least loosely secured in the lower socket. Having thus loosely secured both the line conductor and the tap conduc-

tor in the connector, the lineman next takes a compression tool, which has dies at one of its ends, and places the dies around the opposite ends of the connector. Finally, he closes the handles of the compression tool, thereby crimping and shaping the sockets of the connector around the line conductor and the tap conductor. The H-frame connector has now been installed.

Two important goals in developing processes in this area are 1) to achieve the snuggest possible fit between the connector and the power lines, and 2) to minimize the amount of energy and effort necessary to obtain a snug fit.

In the application that led to the patent in suit, Zemels stated both of these goals as objects of his invention. The key to attaining these goals, according to Zemels, was the presence of "channels" or "voids" of a particular size and in a particular position in the body of the compression connector. (See Numbers 14 and 16 in Figures 1–6, Appendix A). These channels or voids, and the details regarding their size and position, are essential to all the claims of the Zemels patent.[9]

9. The nine claims of the Zemels patent are as follows:

1. In a compression connector of the character described having oppositely disposed conductor-receiving sockets, one of said sockets being of larger cross-sectional dimension than the other, and a body of ductile metal extending crosswise of said connector between said sockets, the improvement which comprises said crosswise extending body of metal having a void therein for accommodating compression of said body to shorten the distance between said sockets, said void being located in spaced relation with both sockets and substantially closer to the smaller socket than to the larger socket.

2. The connector of claim 1 wherein the cross-sectional area of the void is between 0.034 and 0.046 of the cross-sectional area of the connector including the void but excluding the socket space.

3. The connector of claim 1 wherein the void delineates constrictions in said crosswise extending body, said constrictions extending from said void to each of said sockets, and the constrictions extending to the larger socket are of greater length than the constrictions extending to the smaller socket.

4. In a compression connector of the character described having oppositely disposed

conductor receiving sockets, each of said sockets being proportioned to receive conductors whose outside diameters vary between a maximum and a minimum, and a body of ductile metal extending crosswise of said connector between said sockets, the improvement which comprises: said body having a void substantially spaced from said sockets and extending for the full length of said body, and said void having a cross-sectional area of between 0.034 and 0.046 times the cross-sectional area of the connector including the void but excluding the socket space.

5. The improvement of claim 4 wherein said void is open to the exterior of said connector.

6. The improvement of claim 4 wherein said void is delineated by channels on the exterior of said body at opposite sides of the connector.

7. The connector of claim 6 wherein the average dimension h of said channels in the direction parallel to a plane including the axes of both sockets is

$$0.0200 \pm 15\% \ (C/B)$$

and the average dimension b thereof in the direction perpendicular to said plane is

$$0.1500 \pm 15\% \ (W)$$

The Zemels patent must be considered against a background in which various compression connectors were developed. Kearney began to manufacture and sell H-frame connectors in the early 1940's. Kearney's original H-frame connector, which was covered by the Graham patent,[10] had no channels in its sides. The original H-frame connector was improved upon by the Hoffman patent,[11] which was issued in 1955 and which was, like the Graham patent, assigned to Kearney. The Hoffman patent taught the addition of tabs to two of the arms of the connector. Kearney developed a series of connectors based on the Hoffman patent known as the 81 series connectors, which required twelve different sizes of connectors to accommodate the 78 different sizes of conductors that were then in use. The Series 81 connectors were manufactured and sold during the 1950's and 1960's.

Ten of the 12 sizes of Series 81 connectors could be properly crimped around the conductors by means of a hand compressor, but two models could be properly crimped only by means of a hydraulic compressor. This fact made the latter two models less desirable; a hydraulic compressor is more expensive and heavier than the hand tool and is not well regarded by the utility companies, which are the major consumers of compression connectors.

Kearney realized that these two models of connectors were less marketable than

they would have been if they had been crimpable by a hand tool. Several Kearney employees, including William Olive, the Chief Engineer, and John Thornton, Zemels' supervisor, considered the problem.

In November, 1963 Zemels, a Kearney design engineer, began to consider the problem. Zemels had been graduated with the title of mechanical engineer from a university in the Soviet Union. After coming to the United States in 1949, he had worked as a design engineer for almost 14 years.

In January, 1964 Zemels developed sketches of an H-frame compression connector with channels, which he showed to Thornton. He was authorized by Thornton and Olive to do formal work on the matter. Zemels then considered the details of the proper size and location of the channels that would be necessary to attain the optimal fit in the crimping process. He concluded, *inter alia*, that in connectors with different sized sockets, the smaller socket should have thicker arms (or "lips") than the larger socket so that the crimping process, which had to close both sockets at once, would result in a snug fit around both the larger line conductor and the smaller tap conductor. Zemels concluded further that this thickening of the arms of the tap socket in connectors with different sized sockets should be accompanied by a shifting of the channels from the midpoint of the connector to a point closer to the tap socket.

where W is the dimension of the connector parallel to b and C is the cross-sectional area of the connector including the channels but excluding the socket space.

8. The connector of claim 7 wherein the shortest distance d between each channel and the smaller socket is related to the shortest distance d' between each channel and the larger socket according to the formula:

$$\frac{d'}{d} = \frac{D_L}{D_s} + \left( \frac{D_L - D_s}{t} \times \frac{KW}{t} \right) - \left( \frac{D_L - D_s}{W - t} \times \frac{t}{KW} \right)$$

where K is a coefficient having a value of $0.33 \pm 0.05$, where t is the distance between the bottoms of opposite sockets, where $D_L$ and $D_s$ are the widths of the larger and smaller sockets respectively, and where the other values are as indicated in claim 7.

9. An H-frame compression connector having opposite sockets for the reception re-

spectively of line conductors and tap conductors, said sockets having smooth concave bottom surfaces intervened by a crossbar of metal, said crossbar having indentations at the opposite sides of said crossbar, said indentations extending lengthwise of the connector and each having a cross-sectional area of between 4% and 12% of the sum of the cross-sectional areas of the sockets, whereby said connector is compressible to the same ultimate cross-section, in the same compression dies, about conductors whose outside diameters vary between 100% (minus clearance) and 60% of the width of said sockets. U.S. Patent No. 3,322,888.

10. U.S. Patent No. 2,307,216. *See Scope and Content of the Prior Art, infra.*

11. U.S. Patent No. 2,707,775. *See Scope and Content of the Prior Art, infra.*

In March, 1964 Zemels conducted his first tests on his prototypes. His superiors at Kearney were favorably impressed with his progress, and he continued to work on the project of finding suitable replacements for the two problematic models in Kearney's Series 81 connectors. By early 1965, Zemels had finished the basic work on the two connectors that were later to replace the two troublesome models in Series 81. Between November, 1966 and November, 1967, Zemels redesigned Kearney's entire Series 81 on the basis of his insights. In the process he reduced the number of models from 12 to seven, which comprise Kearney's Ultra Squeezon 500 series of connectors.

In June, 1964 Zemels, through Kearney's patent attorney, filed an application with the Patent Office. This application was rejected.[12] The application that ultimately led to the Zemels patent was not filed until May, 1966, and the patent was not granted until May 30, 1967.

### IV.

The guidelines for analysis under Section 103 are set forth in *Graham v. John Deere Co.,* 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966):

> Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined. Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding

the origin of the subject matter sought to be patented. As indicia of obviousness or nonobviousness, these inquiries may have relevancy.

*Id.* at 17–18, 86 S.Ct. at 695. *Accord, Sakraida v. Ag Pro Inc.,* 425 U.S. 273, 280, 96 S.Ct. 1532, 47 L.Ed.2d 784 (1976), *rehearing denied,* 426 U.S. 955, 96 S.Ct. 3182, 49 L.Ed.2d 1194 (1976); *Dann v. Johnston,* 425 U.S. 219, 96 S.Ct. 1393, 47 L.Ed.2d 692 (1976); *U. S. Philips Corp. v. National Micronetics, Inc.,* 550 F.2d 716, 719 (2d Cir.), *cert. denied,* 434 U.S. 859, 98 S.Ct. 183, 54 L.Ed.2d 131 (1977).

*The Scope and Content of the Prior Art*

[1] In determining the relevant scope of the prior art, a court is to look, "in light of both the training of the patentee and the elements in the claimed invention which give it its novel quality, at what arts the patentee could reasonably be expected to consult in doing the inventing [citations omitted]" *Digitronics Corp. v. New York Racing Association, Inc.,* 553 F.2d 740, 745 (2d Cir.), *cert. denied,* 434 U.S. 860, 98 S.Ct. 187, 54 L.Ed.2d 133 (1977).

The elements in the claimed invention that give it its novel quality relate to the size and location of the channels in the H-frame connector, and these elements in context relate to design, mechanical, and electrical engineering. In light of these facts, I find that the relevant scope of the prior art is design, mechanical, and electrical engineering.[13]

The content of the prior art consists of the patents and other learning that were extant at the time of the development of the purported invention in the areas of design, mechanical, and electrical engineering, as those arts pertain to the problems of

---

**12.** For the details of the prosecution of the Zemels patent, *see Attorneys' Fees, infra.*

**13.** This finding does not entail that the scope of the prior art is restricted to design, mechanical, and electrical engineering as those arts pertain to the problems of electrical compression connectors. The scope also includes those arts as they pertain to other reasonably related problems. *See Dann v. Johnston, supra,* 425 U.S. at 228, 96 S.Ct. at 1393 (in determining obviousness issue in case involving data processing

system used in banking industry, Court looked to, *inter alia,* data processing system used in a large business organization); *Graham v. John Deere Co., supra,* 383 U.S. at 35, 86 S.Ct. at 703 ("[t]he problems confronting [the patentee] . . . were not insecticide problems; they were mechanical closure problems. Closure devices in such a closely related art as pouring spouts for liquid containers are at the very least pertinent references.").

electrical compression connectors and related problems. *See, e. g., Preuss v. General Electric Co.*, 392 F.2d 29, 32 (2d Cir.), *cert. denied*, 393 U.S. 834, 89 S.Ct. 105, 21 L.Ed.2d 104 (1968). Relevant to this case are five patents that covered electrical compression connectors and that were extant at the time Zemels was working on his H-frame connector.

(1) *The Graham Patent*[14] This patent, which was applied for in 1941 and granted in 1943, pertains to a basic H-frame connector without channels. Graham teaches that this basic H-frame connector is to be composed of a malleable material that is a good conductor of electricity; that there be in the connector a pair of parallel passages (the "sockets") to receive the conductors that are to be connected; and that the connector is to be subjected to compressive force exerted by a tool so that the connector will be crimped and will securely grip the conductors that have been placed in the passages.

(2) *The Hoffman Patent*[15] This patent, which was applied for in 1951 and was granted in 1955, improved on the connector covered by the Graham patent by adding to the connector the bendable tabs, which are extensions of the socket arms and which allow a lineman to make a temporary fitting of the connector on the conductors by using his fingers to bend the tabs down into the sockets. Hoffman also teaches, although it does not claim, the addition of channels in the body of the connector. This teaching is present both in Figures 8 and 9 of the Hoffman drawings (*see* Appendix C) and in the application itself, which states in part:

Figs. 8 and 9 illustrate a form of the invention according to which each side face of the body portion 1b of the connec-

tor Ab has formed therein a groove 11 that preferably though not necessarily, is V-shaped, as is shown in Fig. 8. The grooves 11 preferably extend in the direction of the diameter of the body portion of the connector, from one side of said body portion to the opposite side thereof, and by applying portions of a suitable tool T to the grooves, as is shown in Figs. 8 and 9 and causing said tool portions to move toward each other, a compressed connector will be forced open, as is shown in Fig. 9, for removal of the connector.

U.S. Patent No. 2,707,775.

Thus Hoffman expressly discloses channels between the sockets. Under the Hoffman patent the purpose of such channels is to facilitate opening an already crimped connector.

(3) *The Toedtman '069 Patent*[16] This patent, which was applied for in 1957 and granted in 1960, discloses an electrical compression connector in the shape of a "6". This patent discloses the use of channels in the external sides of the connector body. (*See* Numbers 11 and 12 of Figures 1 and 4, Appendix D). The patent also discloses sockets of different sizes. The channels, which are expressly claimed by the patent, are disclosed to be closer to the smaller socket than they are to the larger socket. The stated object of the channels is to facilitate a better fit of the connector around the conductor:

The described provisions allow the parts to yield and be formed about the wire and reduce the pressure requirements to accomplish this result, and, importantly, when compression is applied, function to induce an inward collapse of the said neck portion. Such is desirable to eliminate gaps and to produce a strong, full surface

---

14. The drawings that were filed with the application for this patent are found in Appendix B to this Opinion.

15. The drawings that were filed with the application for this patent are appended hereto in Appendix C.

16. U.S. Patent No. 2,938,069. The drawings that were filed with the application for this patent are appended hereto in Appendix D.

contact between the connector and the wire.

U.S. Patent No. 2,938,069.

(4) *The Toedtman '764 Patent*[17] This patent, which was applied for in 1962 and granted in 1964, pertains to an H-frame connector and discloses the use of channels on the interior of the sockets. (*See* Numbers 17 and 22 of Figure 2, Appendix E). The patent claims the objects of such channels to be to accommodate a wide range of sizes of conductors in the sockets and to facilitate a snugger fit between the sockets and the conductors.

(5) *The Lynch Patent*[18] This patent, which was applied for in 1963 and granted in 1965, while Zemels himself was working on his invention, pertains to an H-frame connector and a means for temporarily holding the conductors. The patent discloses the use of channels in the outside of the body of the connector. (*See* Numbers 25 and 26 of Figure 2, Appendix F). The channels are expressly claimed; their purpose is stated to be to hold bars that run through the channels and through holes in the "temporary cable [*i. e.*, connector] holding means." The "temporary cable holding means" are plates (*see* Figure 1, Appendix F) that are temporarily placed on the ends of the connector to hold the conductors in place in the sockets while the lineman prepares to crimp the connector. The "temporary cable holding means" thus take the place of the tabs, which have been seen in the Hoffman patent, the Toedtman '069 patent, and the Zemels patent.

---

**17.** U.S. Patent No. 3,156,764. The drawings that accompanied the application for this patent are found in Appendix E.

**18.** U.S. Patent No. 3,183,025. The drawings that accompanied the application for this patent are found in Appendix F.

**19.** The Toedtman '069 patent does not expressly claim the use of a channel to accommodate the compression of the connector's body. However Figure 4 of the drawings that accompanied the application that led to Toedtman '069 discloses that the use of a channel produces this result. (*See* Appendix D). Thus, the claim of using the channel to accommodate the compression of the connector's body does not distinguish claim 1 of the Zemels patent from the prior art. *Graham v. John Deere Co., supra*, 383 U.S. at 31 n. 17, 86 S.Ct. at 701 n. 17

*Differences Between the Prior Art and the Claims at Issue*

The principal claim in the Zemels patent is claim 1, which reads as follows:

1. In a compression connector of the character described having oppositely disposed conductor-receiving sockets, one of said sockets being of larger cross-sectional dimension than the other, and a body of ductile metal extending crosswise of said connector between said sockets, the improvement which comprises, said crosswise extending body of metal having a void therein for accommodating compression of said body to shorten the distance between said sockets, said void being located in spaced relation with both sockets and substantially closer to the smaller socket than to the larger socket.

U.S. Patent No. 3,322,888.

There are no differences between this claim and the prior art. The H-frame connector was taught by Graham. The use of sockets of different sizes in a connector was disclosed by the Toedtman '069 patent. The use of a body of ductile metal between the sockets was taught by Graham. The use of a channel in the body of the connector was disclosed by Hoffman. The use of such a channel to accommodate the compression of the body was taught by the Toedtman '069 patent[19] and was also clearly foreshadowed by the Toedtman '764 patent.[20] Thus, the claim of using the channels to accommodate

---

("While the sealing feature was not specifically claimed in the [prior art] patent, it was disclosed in the drawings and specifications. Under long-settled law the feature became public property. [citation omitted]").

**20.** The Toedtman '764 patent placed the channels inside of the sockets. (*See* Numbers 16 and 21 of Figure 2, Appendix E). The patent claimed one of the purposes of such channel to be to "caus[e] the arms to bend inwardly at the [socket] bottom and [to] preclud[e] bulging of said arms in this region." Thus, the idea of the Toedtman '764 channel is to attain the snuggest possible fit between the connector's socket and the conductor, and doing so would have entailed accommodating the compression of the body of the connector.

the compression of the body does not distinguish claim 1 of the Zemels patent from the prior art.[21] Nor does the final portion of claim 1, that the channel is located substantially closer to the smaller socket than to the larger socket, distinguish claim 1 from the prior art. That relation of channel to sockets was taught by the Toedtman '069 patent. (*See* Figure 1, Appendix D).

Claims 2 and 3 of the Zemels patent,[22] which give specific mathematical information about the connector described in claim 1, differ from the prior art only in the greater specificity with which they describe the spatial relations between various components of the connector.[23]

Claim 4,[24] besides repeating many of the claims made in claim 1 and the mathematical information stated in claim 2, states that the channel extends the full length of the body of the connector. This does not distinguish claim 4 from the prior art because extending the channel the full length of the connector was disclosed by both the Toedtman '069 patent (*see* Number 11 of Figures 1 and 2, Appendix D) and the Lynch patent. (*See* Number 26 of Figure 2, Appendix F).

Claim 5[25] is not different from the prior art because the placement of the channel on the exterior of the connector was taught by Hoffman, Toedtman (the '069 patent), and Lynch. Claim 6[26] is not different from the prior art for the same reason that claim 5 is not.

Claims 7 and 8,[27] which give specific mathematical information about the connector of claim 6, differ from the prior art only in the greater specificity with which they describe the spatial relations of various components of the connector.

Claim 9[28] does not differ from the prior art by claiming that the connector is compressible to the cross-section of the sockets because the idea of such compression was taught by others as far back as Hoffman. (*See* Figure 3, Appendix B). However, claim 9 does differ from the prior art by stating the mathematical proposition that such compression may be attained around a set of conductors whose outside diameters vary between 100% (minus clearance) and 60% of the width of the sockets.

*The Level of Ordinary Skill in the Pertinent Art*

"35 U.S.C. § 103 provides for a specialized reasonable man test for obviousness." *Preuss v. General Electric Co., supra*, 392 F.2d at 32. In this case the reasonable person is the person with ordinary skill in design, mechanical, and electrical engineering. *See id.*

I find that the level of ordinary skill in those arts is such that a reasonable engineer engaged in those arts would have at least a college education and would be thoroughly educated in mathematics, physics, and mechanics. *Cf. Lerner v. Child Guidance Products, Inc.*, 406 F.Supp. 560, 565 (S.D.N.Y.1975) ("In determining the issue of obviousness we must assume that the patentee was aware of all of this prior art when he made the invention. [citation omitted]"), *aff'd*, 547 F.2d 29 (2d Cir. 1976) (*per curiam*).

Thus the question becomes, "what would have been obvious to a reasonable [engineer] who, among other things, had the

---

21. Even if this claimed use of the channel did distinguish claim 1 from the prior art, that use of the channel would not render the Zemels patent valid. *See General Electric Co. v. Jewel Co.*, 326 U.S. 242, 247, 66 S.Ct. 81, 90 L.Ed. 43 (if A patents x without realizing virtue v of x, B cannot obtain a patent on x on the basis of B's being the first one to perceive virtue v in x).

22. *See supra* n. 9.

23. Whether or not this difference and the differences to be noted between claims 4 through 9 and the prior art render the Zemels patent's

subject matter sufficiently different under Section 103 remains to be discussed. *See infra*.

24. *See supra* n. 9.

25. *See supra* n. 9.

26. *See supra* n. 9.

27. *See supra* n. 9.

28. *See supra* n. 9.

[Graham, Hoffman, Toedtman, and Lynch] patents in mind when he endeavored to solve the problem" of the Kearney Series 81 connectors? *Preuss v. General Electric Co., supra,* 392 F.2d at 32–33. This question is to be answered in light of the factual background that has been provided above pursuant to the guidelines of *Graham v. John Deere Co., supra,* 383 U.S. at 17, 86 S.Ct. at 684.

### Obviousness and Patent Validity

All of the physical elements of the connector covered by the Zemels patent were known in the prior art. Therefore, the question is "whether the combination of the old elements created a valid combination patent." *Anderson's-Black Rock v. Pavement Co.,* 396 U.S. 57, 59, 90 S.Ct. 305, 307, 24 L.Ed.2d 258 (1969).

In answering this question, I heed the admonition that " '[c]ourts should scrutinize combination patent claims with a care proportional to the difficulty and improbability of finding invention in an assembly of old elements. . . .' " *Sakraida v. Ag Pro Co.,* 425 U.S. 273, 281, 96 S.Ct. 1532, 1537, 47 L.Ed.2d 784 (1976) (quoting *Great A. & P. Tea Co. v. Supermarket Corp.,* 340 U.S. 147, 152, 71 S.Ct. 127, 95 L.Ed. 162 (1950)). *See Julie Research Laboratories, Inc. v. Guideline Institute, Inc.,* 501 F.2d 1131, 1136 (2d Cir. 1974) (a combination patent must be scrutinized with special care).

■ A useful test to be applied in cases involving the question of the obviousness of combination patents was stated by Mr. Justice Stevens while he was still a Circuit Judge. He stated that in such cases a court ought to ask:

[F]irst, whether each element of the invention is obvious; second, if so, whether the combination is obvious, and third, if the combination seems obvious in itself, whether the rejection of the contrary teaching in the prior art requires a differ-

ent conclusion [than that the combination is obvious].

*E–T Industries, Inc. v. Whittaker Corp.,* 523 F.2d 636, 641 (7th Cir. 1975), *cert. denied,* 429 U.S. 870, 97 S.Ct. 182, 50 L.Ed.2d 150 (1976). *Accord, Airtex Corp. v. Shelley Radiant Ceiling Co.,* 536 F.2d 145, 150 (7th Cir. 1976). *See Julie Research Laboratories, Inc. v. Guideline Institute Inc.,* 501 F.2d 1131, 1134 (2d Cir. 1974).

■ Applying the *E–T Industries* test to the instant case, I find, first, that each element of the claimed invention was obvious. As stated above, the H-frame connector itself, the use of sockets of different sizes, the use of a body of ductile metal, the use of channels in the body, and the placement of the channels closer to the smaller socket than to the larger socket were all elements that had been developed in the prior art. They must be deemed to have been obvious to a reasonable engineer.

Second, I find that the combination of the elements in Zemels' invention was obvious. Zemels did combine the elements of the connector in new ways, at least in the sense that he described, in his claims 2, 3, 7–9, the relationships of the elements with greater mathematical specificity than had been done before. However, the fact that these combinations were new does not mean that they were not obvious. To the contrary, I find that a reasonable engineer, with the relevant prior art before him and with a thorough knowledge of mathematics, physics, and mechanics, would have found these new combinations obvious.[29]

Nor is this a case in which the combination must be found to be nonobvious because the combination produced a "synergistic" result. *See Sakraida v. Ag Pro Inc., supra,* 425 U.S. at 282, 96 S.Ct. at 1537. That is, the combination did not "result in an effect greater than the sum of the several effects [of the elements] taken separately." *Id.* (citing *Anderson's-Black Rock, su-*

---

**29.** Plaintiff has argued vigorously that the mathematical formulae and specifications in Zemels' claims are inaccurate, misleading, and useless. I need not consider plaintiff's argument at this point because I find that those formulae and specifications, even if they are correct and helpful, would have been obvious to a reasonable engineer who set out to solve the problem of improving the H-frame connector. *But see Attorneys' Fees, infra.*

*pra,* 396 U.S. at 57, 90 S.Ct. at 305). It may be granted that the combination resulted in significant improvements in H-frame connector technology, including the obtaining of a more desirable fit between the connector and the conductors by the exertion of less force than had been necessary in the past; the ability to effect such a fit on all models of conductors by means of a hand compressor (rather than a hydraulic compressor); and the reduction from 11 to seven in the number of models of connectors necessary to connect all the sizes of conductors then in use. However, these improvements are not sufficient to negate the finding of obviousness under Section 103:

> Rather, this patent simply arranges old elements with each performing the same function it had been known to perform, although perhaps producing a more striking result than in previous combinations. Such combinations are not patentable under standards appropriate for a combination patent. . . . Exploitation of the principle[s] of [mathematics] adds nothing to the sum of useful knowledge where there is no change in the respective functions of the elements of the combination; this particular use of the assembly of old elements would be obvious to any person skilled in the art of mechanical application. See *Dann v. Johnston,* ante, [425 U.S.] at 229–230 [96 S.Ct. at 1399, 47 L.Ed.2d at 699].

Though doubtless a matter of great convenience, producing a desired result in a cheaper and faster way, and enjoying commercial success, [this connector] "did not produce a 'new or different function' . . . within the test of validity of combination patents." *Anderson's-Black Rock v. Pavement Co.,* supra, [396 U.S.]

at 60 [90 S.Ct. at 308, 24 L.Ed.2d, at 261]. These desirable benefits "without invention will not make patentability." *Great A. & P. Tea Co. v. Supermarket Corp.,* 340 U.S., at 153 [71 S.Ct. at 130, 95 L.Ed., at 167]. See *Dann v. Johnston,* ante, at 230 n. 4 [96 S.Ct., at 1399, 47 L.Ed.2d, at 699].

*Sakraida, supra,* 425 U.S. at 282–83, 96 S.Ct. at 1537.[30]

Further applying the test of *E–T Industries,* I find, third, that a conclusion different than that the combination was obvious is not required by "the rejection of the contrary teaching in the prior art . . ." *E–T Industries, Inc., supra,* 523 F.2d at 641. The question to be asked here is, is there "evidence that long accepted factors would deter any investigation into the combination used by [Zemels]"? *Id.* at 642. See *United States v. Adams,* 383 U.S. 39, 52, 86 S.Ct. 708, 714, 15 L.Ed.2d 572 (1966) ("known disadvantages in old devices that would naturally discourage the search for new inventions may be taken into account in determining obviousness."). The record here reveals no evidence of factors that would have deterred Zemels' investigation into the combination he finally used. To the contrary, the combination that he finally used was clearly foreshadowed by several developments in the prior art, and these developments occurred in a fairly regular and unimpeded manner beginning with the Graham patent in 1943. There were no deterrents to an investigation of the mathematics and mechanics involved in the use of the H-frame connector. In fact it is likely that many of Zemels' predecessors themselves investigated the relevant mathematics and mechanics and that the only difference between those predecessors and Zem-

---

**30.** Kearney has argued that another significant effect of the combination in Zemels' invention is that connectors that comply with Zemels' invention are able to pass a particular heat cycle test, allegedly deemed of critical importance by the utility companies, while no connectors that do not comply with Zemels' invention can pass that test. There is record evidence to cast doubt on that claim; however, even if the claim were conceded, it would be of no help to Kearney. First, the fact that a Zemels' conductor can pass such a test is not a

"synergistic" result within the meaning of *Sakraida.* Second, the claim is not even available to Kearney at this point in the proceedings because it was not made in the specifications of the patent. *Lincoln Co. v. Stewart-Warner Corp.,* 303 U.S. 545, 550, 58 S.Ct. 662, 665, 82 L.Ed. 1008 ("No such function . . . is hinted at in the specifications of the patent. If this were so vital an element in the functioning of the apparatus it is strange that all mention of it was omitted.") (footnote omitted).

els himself was that he chose to rely on mathematical formulae and specifications in his patent application claims.

I conclude, therefore, that the Zemels patent's "subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art . . . ." 35 U.S.C. § 103. Because this conclusion seems to me to be clear, I find it inappropriate to consider the "secondary considerations," *Graham, supra,* 383 U.S. at 17, 86 S.Ct. 684, that Kearney urges upon me. Kearney advances a sizeable number of such considerations, including acceptance of the invention by others, the commercial success of the patented conductor, and the copying of the invention by others, including Burndy. However, when the finding of obviousness is mandated by other factors, such secondary considerations do not change that finding. *Graham, supra,* 383 U.S. at 36, 86 S.Ct. at 703 ("these [secondary] factors do not, in the circumstances of this case, tip the scales of patentability."). *Accord, Roanwell Corp. v. Plantronics, Inc.,* 429 U.S. 1004, 1009, 97 S.Ct. 538, 50 L.Ed.2d 617 (1976) (White, J., joined by Brennan, J., dissenting from denial of writ of certiorari); *Dann v. Johnston, supra,* 425 U.S. at 230 n. 4, 96 S.Ct. at 1393; *Anderson's-Black Rock, supra,* 396 U.S. at 61, 90 S.Ct. at 305; *Digitronics Corp. v. New York Racing Association, Inc.,* 553 F.2d 740, 748 (2d Cir.) ("Only in a close case,

in which application of the subjective criterion of nonobviousness in 35 U.S.C. § 103 does not produce a firm conclusion, can those objective or secondary considerations be used to 'tip the scales in favor of patentability' [citations omitted]. Because we hold that the claims here are clearly obvious, we need not examine secondary considerations. [citations omitted])", *cert. denied,* 434 U.S. 860, 98 S.Ct. 187, 54 L.Ed.2d 133 (1977).[31]

## VI.

*Attorneys' Fees*

■ Burndy contends that it is entitled to attorneys' fees because Kearney's conduct in prosecuting the Zemels patent[32] makes this an "exceptional case" within the meaning of 35 U.S.C. § 285.[33]

Burndy's claim for attorneys' fees must be analyzed in light of the general rule that each party is to bear its own attorneys' fees:

In patent suits, no less than other types of suits in the federal courts, it is the general rule that awarding attorneys' fees to the prevailing party is not favored absent a specific statute providing therefor. Here we have such a statute, but the relief it provides is not usually granted. The patent suit involved must qualify as an "exceptional" case. It is obvious from the language of 35 U.S.C. § 285 that

---

**31.** The result reached here is not contrary to the doctrine, heavily relied on by Kearney, that a patent, once issued, is presumed to be valid. For " 'the most that can be said of the presumption is that it requires that reasonable doubt on the question of validity be resolved in favor of the patent holder.' " *Lemelson v. Topper Corp.,* 450 F.2d 845, 849 (2d Cir. 1971) (quoting *Lorenz v. F. W. Woolworth Co.,* 305 F.2d 102, 105 (2d Cir. 1962). *Accord, Ken Wire & Metal Products, Inc. v. Columbia Broadcasting System,* 338 F.Supp. 624, 629 (S.D.N.Y. 1971), *aff'd,* 464 F.2d 1393 (2d Cir. 1972) (*per curiam*). There is no such reasonable doubt here.

Moreover, Kearney's heavy reliance on the district court opinion in *Plantronics, Inc. v. Roanwell Corp.,* 403 F.Supp. 138 (S.D.N.Y. 1975), *aff'd,* 535 F.2d 1397 (2d Cir.) (*per curiam*), *cert. denied,* 429 U.S. 1004, 97 S.Ct. 538, 50 L.Ed.2d 617 (1976) *rehearing denied,* 429 U.S. 1079, 97 S.Ct. 826, 50 L.Ed.2d 800 (1977), is misplaced. In their dissent from the denial

of certiorari, Justices White and Brennan criticized the district court opinion for failing to follow the *Graham* guidelines and for relying instead on "secondary considerations" as to the issue of obviousness. 429 U.S. at 1009, 97 S.Ct. 538. More recently, the Second Circuit, in a case in which it found no need even to reach the secondary considerations, recognized the importance of the dissent from the denial of certiorari in *Plantronics* and stated that the Second Circuit rule is in accord with that dissent. *Digitronics, Inc., supra,* 553 F.2d at 748–49 n. 5.

**32.** The Zemels patent was granted to Carl G. Zemels, who assigned it to Kearney. The patent was prosecuted by Kearney's legal staff. Therefore, although the patent was granted to Zemels, Kearney is responsible for the conduct that occurred in the prosecution of the patent.

**33.** *See supra* n. 2.

Congress intended the trial court to exercise its sound discretion in deciding whether a case was sufficiently exceptional to vitiate the normal rule that each party bear his own attorneys' fees.

*Kahn v. Dynamics Corp. of America,* 508 F.2d 939, 945 (2d Cir.), *cert. denied,* 421 U.S. 930, 95 S.Ct. 1657, 44 L.Ed.2d 88 (1975).

The recognized categories of exceptional cases under Section 285 include cases involving fraud on the patent office, *Digitronics, Inc. v. New York Racing Association, Inc., supra,* 553 F.2d at 749; gross negligence or bad faith in the prosecution of a patent, *Kahn v. Dynamics Corp. of America, supra,* 508 F.2d at 945; and unclean hands in the prosecution of a patent. *Timely Products Corp. v. Arron,* 523 F.2d 288, 305 (2d Cir. 1975); *Trans-World Display World Corp. v. Mechtronics Corp.,* 437 F.Supp. 692, 703 (S.D.N.Y.1977) (dictum). I find that Kearney's conduct does not fall into any of these categories.

The Zemels patent is based on a continuation in part application. The first application, filed in June, 1964, was abandoned after it had been rejected by the examiner. In the original application, Zemels stated that "[p]referably, but not necessarily" the distance from the channel to the bottom of the smaller socket is slightly less than the distance from the channel to the larger socket. This language suggested that the relative spacing of the channels to the sockets was not critical. Thus the original application would have permitted the channels, if placed on the outside of the connector body, to be spaced equidistant from the two sockets. The original application also stated that the channels could be located inside the sockets.

The examiner rejected all claims of the original application. He found that the Hoffman patent and the Toedtman '764 patent anticipated Zemels' claims.

Zemels then amended his claims by specifying that the channels be located on the outside of the connector body. The examiner, citing the Lynch patent, again rejected Zemels' claims.

Soon thereafter Zemels abandoned his original application, but, before doing so, he filed the continuation in part application, in which there appeared mathematical formulae expressing the spatial relations among various of the connector's elements. The examiner rejected the claims in the second application on the basis of, *inter alia,* the Lynch patent, and the examiner stated that he did not understand the mathematical formulae that appeared in the second application. Zemels and Kearney sought to explain the formulae and stated that the formulae yielded a "dividing line" between compression connectors that could be expected to perform well in certain respects and connectors that could not so perform. Zemels' trial testimony on this matter was somewhat unclear and equivocal, but he appeared to admit that the formulae did not yield a dividing line of such a critical nature that it could never be crossed or altered, and that he himself sometimes purposely designed connectors that fell outside the claimed range in order to obtain certain improvements.

It may be that the claims asserting the formulae would never have been made if the examiner had not rejected Zemels' first application. It may be, too, that the examiner did not fully understand the mathematical formulae that appeared in Zemels' second application and that Zemels and the other Kearney agents were unsuccessful in explaining to the examiner the purpose of the formulae. However, the mere fact that Kearney undertook the usual jockeying that occurs in the prosecution of a patent and that Zemels and the other Kearney agents may have been less than successful in their efforts to instruct the examiner on the details of the mathematics contained in the second application does not mean that Kearney has abused the patent office in such a way as to require that an award of attorneys' fees be made to Burndy.

On the basis of the testimony that I have heard and the papers before me, I cannot conclude that Kearney was guilty of fraud, bad faith, gross negligence, or unclean hands in its prosecution of the Zemels patent. Burndy's request for an award of attorneys' fees under 35 U.S.C. § 285 is denied.

Settle Judgment on Notice.

Appendices to follow.

APPENDIX A

May 30, 1967      C. G. ZEMELS      3,322,888

COMPRESSION CONNECTOR

Filed May 12, 1966      2 Sheets-Sheet 1

FIG. 1.

FIG. 2

INVENTOR
CARL G. ZEMELS
BY

ATTORNEY

May 30, 1967          C. G. ZEMELS          3,322,888
COMPRESSION CONNECTOR

Filed May 12, 1966                    2 Sheets-Sheet 2

FIG. 3.          FIG. 4.

FIG. 5.          FIG. 6.

INVENTOR
CARL G. ZEMELS
BY
ATTORNEY

APPENDIX B

Jan. 5, 1943.  R. GRAHAM  2,307,216

CONNECTOR

Filed April 21, 1941

*Fig. 1*

*Fig. 2*

*Fig. 3*

*Fig. 4*

*Fig. 5*

*Fig. 6*

INVENTOR

ROY G. GRAHAM

BY *E.M.Harrington,*

ATTORNEY

APPENDIX C

May 3, 1955                J. D. HOFFMAN ET AL                2,707,775
                        ELECTRICAL CONNECTORS
                        Filed Jan. 22, 1951

FIG. 1.

FIG. 2.

FIG. 3.

FIG. 4.

FIG. 8.

FIG. 5.

FIG. 6.

FIG. 7.

FIG. 9.

INVENTORS.
JOSEPH D. HOFFMAN
BY EUGENE E. HOLKE

ATTORNEY

APPENDIX D

May 24, 1960

J. A. TOEDTMAN

COMPRESSION TYPE ELECTRICAL CONNECTORS

Filed March 7, 1957

FIG. 1.

FIG. 2.

FIG. 4.

FIG. 3.

FIG. 5.

FIG. 6.

INVENTORS
JOHN A. TOEDTMAN,
WILLIAM E. WILTON
BY
Terry and Cohn
ATTORNEYS.

APPENDIX E

Nov. 10, 1964

J. A. TOEDTMAN
COMPRESSIBLE ELECTRICAL CONNECTOR
WITH INTERNAL DEFORMABLE RIBS
Filed March 26, 1962

3,156,764

INVENTOR
JOHN A. TOEDTMAN
BY Cohin and Powell
ATTORNEYS

APPENDIX F

May 11, 1965    L. S. LYNCH, JR., ETAL    3,183,025

CONNECTOR WITH TEMPORARY CABLE HOLDING MEANS

Filed May 16, 1963

FIG. 1

FIG. 2

FIG. 3

FIG. 4

FIG. 5

INVENTORS
LESLIE S. LYNCH, JR.
J. A. SCHILLER
BY E. L. ELDRIDGE

ATTORNEY