654 F.2d 802
 16 ERC 1804, 210 U.S.App.D.C. 87, 11
Envtl. L. Rep. 20,595
 UNITED STATES of America,
v.
DISTRICT OF COLUMBIA et al.
Appeal of Prince George's County, Maryland (Intervenor-deft.).
STATE WATER CONTROL BOARD et al.
v.
WASHINGTON SUBURBAN SANITARY COMMISSION et al.
Appeal of Prince George's County, Maryland (Intervenor-deft.).
STATE WATER CONTROL BOARD, An Agency of the Commonwealth of
Virginia, et al.
v.
WASHINGTON SUBURBAN SANITARY COMMISSION et al.
Appeal of Prince George's County, Maryland (Intervenor-deft.).
UNITED STATES of America
v.
DISTRICT OF COLUMBIA et al.
Appeal of Prince George's County, Maryland.
STATE WATER CONTROL BOARD et al.
v.
WASHINGTON SUBURBAN SANITARY COMMISSION et al.
Appeal of Prince George's County, Maryland.
UNITED STATES of America
v.
DISTRICT OF COLUMBIA et al.
Appeal of Prince George's County, Maryland.
 Nos. 80-1653, 80-1654, 80-1718, 80-1719, 80-1495 and 80-1496.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued April 9, 1981.
Decided June 10, 1981.
As Amended July 29, 1981.
 
 Frank W. Stearns and David T. Stitt, Asst. County Attys., Fairfax, Va., also entered appearances for appellee, Fairfax County, Va.
 Judith W. Rogers, Corp. Counsel, Joyce M. Notarius, Richard G. Wise and Edward L. Curry, Assistant Corp. Counsel, Washington, D. C., were on the brief for appellee, District of Columbia.
 Robert B. Ostrom, County Atty., Prince George's County, Upper Marlboro, Md., with whom Richard S. Alper and Robert H. Drummer, Associate County Attys., Washington, D. C., were on the brief for appellant.
 Thomas A. Deming, Asst. Atty. Gen., State of Md., Annapolis, Md., for appellee, State of Md.
 John P. Arness, Washington, D. C., with whom Curtis E. von Kann, Allan D. Windt and Henderson J. Brown, IV, Washington, D. C., were on the brief for appellee, Washington Suburban Sanitary Commission.
 Rosanne Mayer, Atty., Dept. of Justice, Washington, D. C., with whom James W. Moorman, Asst. Atty. Gen., Anne S. Almy and Patrick J. Cafferty, Jr., Atty., Dept. of Justice, Washington, D. C., were on the brief, for appellee, United States. Angus Macbeth and Donald W. Stever, Atty., Dept. of Justice, Washington, D. C., also entered appearances for appellee, United States.
 Marshall Coleman, Atty. Gen., James E. Ryan, Jr., Deputy Atty. Gen., and Frederick S. Fisher, Asst. Atty. Gen., Com. of Va., Richmond, Va., were on the brief for appellee, Com. of Va., State Water Control Bd.
 Robert G. Tobin, Jr., Deputy County Atty., Nathan J. Greenbaum, Asst. County Atty., Montgomery County, Rockville, Md., were on the brief for appellee, Montgomery County, Md.
 Before McGOWAN, TAMM and WALD, Circuit Judges.
 Opinion for the Court filed by Circuit Judge WALD.
 WALD, Circuit Judge:
 
 
 1
 This appeal is the latest chapter in an eight-year-old controversy concerning disposal of sewage sludge generated at the Blue Plains Sewage Treatment Plant in the District of Columbia. Since the early 1970's, the parties to this appeal have struggled to devise a plan for sludge disposal at sites within the Washington area jurisdictions which use the Blue Plains facility. Appellant Prince George's County ("P.G. County") opposes appellee Montgomery County's selection of one such site ("Site 2") for its sludge disposal. The district court, however, endorsed the selection of Site 2 in 1978 and ordered the budgeting of funds for its implementation on April 25, 1980, and June 4, 1980. In an effort to block that implementation, P. G. County then instituted a series of state court actions. The district court responded by enjoining further state court proceedings on June 27, 1980. P. G. County argues here that the district court orders of April 25 and June 4 exceeded the court's authority under the Clean Water Act, and that the order of June 27, 1980, violates the Anti-Injunction statute. For the reasons stated below, we disagree.
 
 I. BACKGROUND
 
 2
 On September 24, 1973, the Virginia Water Control Board, Fairfax County, and the District of Columbia brought suit in the United States District Court for the District of Columbia against the Washington Suburban Sanitary Commission ("WSSC")[1] (Civil Action No. 1813-73). The complaint alleged that WSSC, in violation of regional agreements, was exceeding its allotted use of the Blue Plains sewage treatment plant in D.C., thus causing the plant to discharge inadequately treated sewage into the Potomac River.
 
 
 3
 The United States intervened as a party-plaintiff, alleging that excess flow from the WSSC was causing pollution of the Potomac in violation of the Federal Water Pollution Control Act of 1970, 33 U.S.C. § 1251 et seq. Montgomery County, P. G. County, and the State of Maryland intervened as parties defendant. Plaintiffs then amended their complaint to request that P. G. and Montgomery Counties be ordered to comply with another provision of the regional agreement by designating and providing sites for the disposal of sludge[2] generated at the Blue Plains facility.
 
 
 4
 Prior to trial the parties entered into the Blue Plains Sewage Treatment Plant Agreement, which was subsequently incorporated into a Consent Decree dated July 29, 1974. The decree provided that the court would retain jurisdiction to enforce the agreement and required court approval for any modification of it. The agreement established limits on flows to the plant and provided that the user jurisdictions in the Washington metropolitan area would devise a permanent equitable plan for the disposal of sludge produced at Blue Plains by June 30, 1976, and would implement the plan by December 31, 1977. During the interim period the parties agreed to dispose of sludge in proportion to their share of sewage flow to the plant.
 
 
 5
 Despite the requirements of the Consent Decree, the parties failed to agree on a permanent sludge disposal plan. On the eve of the expiration date for the interim plan, the United States filed a complaint in district court (Civil Action No. 77-1929) on November 9, 1977, alleging that the District of Columbia, the WSSC, Montgomery County, P. G. County, and Fairfax County had violated the court's 1974 order by failing to devise a permanent sludge management plan. The complaint further alleged that the impasse over sludge disposal would cause the Blue Plains plant to curtail or eliminate treatment of sewage, thus resulting in increased discharges of pollutants into the Potomac River in violation of the Federal Water Pollution Control Act. Like its predecessor, the 1977 suit led to negotiations culminating in a consent order, dated January 24, 1978, which extended the date of the interim period under the 1974 agreement to September 21, 1978, and extended the deadline for submission of a permanent sludge plan to January 15, 1978.
 
 
 6
 The user jurisdictions again failed to agree on a permanent plan. On May 18, 1978, upon motion of the United States and after hearing, the district court entered an order requiring each jurisdiction to file a report designating a site within its boundaries for disposal of sludge. Montgomery County submitted a report designating two sites for disposal of raw sludge, one of which was an undeveloped tract of land adjacent to the Montgomery Industrial Park on the Montgomery County-Prince George's County border (Site 2). Site 2 was designated as a composting site, where sludge would be mixed with wood chips and aerated for periods of 35-45 days. The Calverton Citizens Association, representing residents of the area surrounding Site 2, submitted a report to the court, alleging that the proposed use of Site 2 would subject them to a health hazard.
 
 
 7
 On July 10, 1978, the court entered an order requiring the user jurisdictions to proceed to develop their designated sites for sludge disposal. In particular, Montgomery County was ordered to have the Site 2 composting facility operational by July 1, 1979. The court ordered WSSC to take all necessary action, including acquisition of property rights and obtaining all necessary permits. The court also ordered that the user jurisdictions take no action unrelated to protection of the public health to prevent the sludge disposal measures ordered. Noting the concerns expressed by the Calverton Citizens Association, the court ordered that Montgomery County through the WSSC take all measures necessary to protect the public health in the implementation of Site 2. P. G. County, which had made known its objections to Site 2 in a letter to the court dated June 28, 1978, did not appeal the July 10 order.[3]
 
 
 8
 The WSSC and Montgomery County then proceeded with the development of Site 2 as required by the 1978 order. The WSSC filed condemnation proceedings to acquire Site 2 in the Circuit Court for Montgomery County, and obtained the requisite permit from the Maryland Department of Health and Mental Hygiene. In May 1979 the WSSC adopted a budget for fiscal year 1980 which included $16.9 million for the acquisition and construction of the Site 2 facility.
 
 
 9
 P. G. County opposed implementation of Site 2 on several fronts outside the forum of the district court. The County unsuccessfully appealed the issuance of the health permit to the Board of Review of the Maryland State Health Department. It also brought suit in the Circuit Court for Prince George's County seeking to enjoin acquisition of Site 2 on grounds it had never given the requisite approval to WSSC funds allotted to Site 2.[4] The Circuit Court dismissed the complaint, and P. G. County appealed.
 
 
 10
 In March 1980 implementation of Site 2 encountered more severe obstacles. First, the three WSSC Commissioners from P. G. County blocked funding for Site 2 in WSSC's budget for fiscal year 1981. In addition, the WSSC learned that a title search of the Site 2 land conducted in connection with the condemnation proceeding had revealed that the land was burdened by restrictive covenants[5] which appeared inconsistent with a compost facility and which might cost millions of dollars to acquire. By letter dated March 18, 1980, the WSSC informed the district court of the budget impasse and the covenants.
 
 
 11
 Montgomery County then filed a motion in district court on April 4 to compel the WSSC to restore funds for Site 2 to its budget. After a hearing at which P. G. County opposed the motion, the court issued an order on April 25 requiring the WSSC to restore the funds and to take all actions necessary to place Site 2 into operation at the earliest practicable date. On May 8 P. G. County noted an appeal from this order, the first of this group of consolidated cases.
 
 
 12
 Despite the April 25 order, the three P. G. County WSSC Commissioners declined to vote to reinsert funds for Site 2 in the budget. Consequently on May 14, 1980, Montgomery County moved the district court to cite the three Commissioners for contempt. The Commissioners defended on grounds that the restoration of funds ordered on April 25 was a purely ministerial act which required no Commission vote. After a hearing the district court on June 4 denied the contempt motion but, finding that reinsertion of the funds was a ministerial act, ordered the General Manager of the WSSC to perform it. On June 5 P. G. County sought a stay from the district court of its April 25 and June 4 orders, and on June 10 it noted an appeal from the June 4 order.[6] The district court denied the motion for stay on June 19.
 
 
 13
 Meanwhile P. G. County had filed two new suits in state court seeking to block implementation of the Site 2 facility. One suit alleged that the state sewage sludge permit was invalid and that Site 2 constituted a prospective nuisance.[7] The second suit alleged that because of the restrictive covenants, acquisition of Site 2 would be so costly as to render the WSSC Commissioners liable for breach of fiduciary duty.[8] In this second suit, the Prince George's County Circuit Court on June 17, 1980, issued a temporary injunction forbidding the WSSC from proceeding with the acquisition of Site 2 and ordering it to withdraw a purchase offer it had made to the owners.
 
 
 14
 WSSC then moved in the district court for an order to protect and effectuate the court's prior judgments, orders and decrees. Following a hearing, the district court on June 27 issued an order which enjoined WSSC from complying with the state court order and further ordered WSSC to proceed expeditiously with development of Site 2; ordered P. G. County to withdraw from the three state court suits relating to Site 2; enjoined all parties from initiating any state court proceeding which would frustrate the district court's orders; and ordered any party believing modification of the court's orders was required to seek such modification only in the district court or in this court.
 
 
 15
 The last of this group of consolidated cases is P. G. County's appeal of the June 27 order. P. G. County's request for a stay of the order was denied first by the district court on the same day and then by this court on July 3. Two such requests for stay were later denied by the Supreme Court. WSSC has proceeded to comply with the April 25 and June 4 orders, has acquired legal title to Site 2 and has let contracts for the construction of the compost facility.
 
 II. ANALYSIS
 A. Tenth Amendment Objections
 
 16
 P. G. County argues that the three challenged district court orders violate principles of federalism embodied in the tenth amendment and affirmed in National League of Cities v. Usery, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976). Appellant alleges that the April 25 and June 4 orders of the district court usurped the power of the WSSC to control its own budget, thereby intruding upon an integral function of a state agency. It further alleges that the June 27 order, by prohibiting further collateral challenges to Site 2 in state courts, usurped the power of the state of Maryland to protect the public health and safety of its citizens. Arguing that the Clean Water Act allocated the primary responsibility for eliminating water pollution to the states, appellant concludes that the broad control over the development of Site 2 asserted by the district court exceeded both its powers under the Act and its equity jurisdiction. We find these arguments without merit.
 
 
 17
 In National League of Cities v. Usery, the Supreme Court held that extension of the Fair Labor Standard Act's minimum wage and maximum hour provisions to state employees was an impermissible exercise of the commerce power because it impaired state sovereignty guaranteed by the tenth amendment. In a plurality opinion the Court held that the power to determine the wages and hours of employees was an "integral" state function, essential to the separate and independent existence of the states. Justice Blackmun, concurring, interpreted the plurality opinion as mandating a balancing approach, protecting states from federal intrusion only where the federal interest did not outweigh the state interest. Justice Blackmun thought it apparent that National League of Cities "does not outlaw federal power in areas such as environmental protection, where the federal interest is demonstrably greater and where state compliance with imposed federal standards would be essential." 426 U.S. at 856, 96 S.Ct. at 2476.
 
 
 18
 We agree that whatever the precise limits of the state sovereignty doctrine set forth in National League of Cities,[9] it clearly does not control where, as here, the federal interest has long been recognized as overriding.[10] The Supreme Court has recently described the 1972 amendments to the Federal Water Pollution Control Act as "a comprehensive program for controlling and abating water pollution." City of Milwaukee v. Illinois, --- U.S. ----, 101 S.Ct. 1784, 1793, 68 L.Ed.2d 114 (1981) (quoting Train v. City of New York, 420 U.S. 35, 37, 95 S.Ct. 839, 841, 43 L.Ed.2d 1 (1975)). While it is clear that Congress contemplated that the states would play an active role in this effort, it is equally clear it did not contemplate that a subdivision of one state would have the power to block a regional plan for sewage disposal, thereby causing injury not only to its own state government but to neighboring states as well. Cf. United States v. Duracell International, Inc., 510 F.Supp. 154 (M.D.Tenn.1981) (rejecting tenth amendment challenge to provision of Clean Water Act holding liable any state which prevents municipality from complying with Act).
 
 
 19
 The courts have recognized the breadth of this federal interest and have upheld federal environmental legislation which, like the Clean Water Act, requires state implementation while leaving the states latitude to make essential choices. See United States v. Ohio Department of Highway Safety, 635 F.2d 1195 (6th Cir. 1980), cert. denied, --- U.S. ----, 101 S.Ct. 2031, 68 L.Ed.2d 334 (1981) (upholding authority of EPA under Clean Air Act to require a state to deny registration to vehicles which have not passed mandatory inspection); District of Columbia v. Train, 521 F.2d 971 (D.C.Cir.1975), vacated as moot sub nom. EPA v. Brown, 431 U.S. 99, 97 S.Ct. 1635, 52 L.Ed.2d 166 (1977) (same).[11] When necessary the courts have exercised broad equitable powers to ensure state compliance with federal environmental laws, even where the exercise of such powers has necessitated the bypassing of normal state decisional processes. Thus after Detroit failed to comply with a consent decree concerning sewage disposal, the district court appointed the Mayor of Detroit as administrator of the treatment plant, and directed him to act "without the necessity of any actions on the part of the Common Council of the City of Detroit when in the judgment of the Administrator the same might unavoidably delay or impede" compliance. United States v. City of Detroit, 476 F.Supp. 512, 515 (E.D.Mich.1979); cf. Washington v. Washington State Commercial Passenger Fishing Vessel Assn., 443 U.S. 658, 99 S.Ct. 3055, 61 L.Ed.2d 823 (1979) (sanctioning district court's direct supervision of state fisheries where necessary to secure compliance with its order recognizing Indian rights).
 
 
 20
 The weakness of appellant's federalism argument is underscored by the fact that it, along with other regional jurisdictions, agreed that the district court should have continuing authority to enforce the 1974 consent decree. P. G. County voluntarily intervened in the initial suit in 1973 and was a signatory to the consent decree which emerged from that suit. Like the other parties to that agreement, appellant failed to comply with the deadlines it had agreed to meet, thereby necessitating enforcement of the agreement by the district court. The tenth amendment cannot be used to bar the very enforcement mechanism agreed to in 1974. Cf. Brown v. Neeb, 25 Fair Empl. Prac. Cases 267 (Lab.Rel.Rep. BNA), 644 F.2d 551 (6th Cir. 1981) (affirming district court order requiring city, which had ordered layoffs from fire department due to budget crisis, to comply with prior consent decree concerning hiring of minorities by making layoffs proportionate to racial composition of the department, even though collective bargaining agreement and state law provided that layoffs should be on basis of seniority).
 
 
 21
 Thus we find that the district court did not exceed its statutory or equitable authority and that no interest protected by the tenth amendment has been infringed.
 
 B. Anti-Injunction Act Objections
 
 22
 Appellant's second contention is that the district court's order of June 27 violates the Anti-Injunction Act, 28 U.S.C. § 2283, which provides:
 
 
 23
 A court of the United States may not grant an injunction to stay proceedings in a state court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments.
 
 
 24
 The Supreme Court has noted that the purpose of the Act, which rests on the fundamental constitutional independence of the states and their courts,[12] is to prevent "needless friction between state and federal courts."[13] The Court has applied the Act strictly,[14] stating that it is an "absolute prohibition" against any injunction of any state court proceedings that does not fall within one of the three specifically defined exceptions in the Act.[15] The issue for decision, then, is whether the June 27 order falls within one of the three exceptions.
 
 
 25
 The district court relied primarily, as do appellees before this court, on the last of the three exceptions, which permits a federal court to enjoin a state proceeding in order to "protect or effectuate" its judgments.[16] Known as the "relitigation" exception, the "protect or effectuate" language was intended to affirm the power of federal courts to enjoin the relitigation of cases and controversies fully adjudicated by such courts.[17] The Supreme Court has construed the exception to mean that a state court may be prevented "from so interfering with a federal court's consideration or disposition of a case as to seriously impair the federal court's flexibility and authority to decide that case." Atlantic Coast Line Railroad Co. v. Brotherhood of Locomotive Engineers, 398 U.S. 281, 295, 90 S.Ct. 1739, 1747, 26 L.Ed.2d 234 (1970).
 
 
 26
 Appellant argues that this exception should be read narrowly to permit an injunction only where the state proceeding involves the same cause of action as did the federal proceeding. Appellant contrasts the cause of action in the federal suit, to ensure compliance with the Clean Water Act by providing for sludge disposal, with the causes of action in the enjoined state proceedings, which involve issues such as compensability of restrictive covenants under Maryland property law. Appellant concludes that the state suits are collateral to, rather than duplicative of, the federal suit and that therefore the relitigation exception does not apply.
 
 
 27
 We believe, however, that Atlantic Coast Line mandates an examination of the effect a state proceeding would have on a prior federal judgment, rather than a comparison of formal causes of action. Where a state court enjoins a course of conduct which is necessary to comply with a prior federal court order, the federal court has authority to effectuate its order by enjoining the state proceeding. In Doe v. Ceci, 517 F.2d 1203 (7th Cir. 1975), a federal district court had enjoined a county hospital from refusing to permit its medical personnel to perform elective abortions within the hospital. Subsequently a state court entered an order restraining county officials from disbursing any county funds for elective abortions. The district court enjoined enforcement of the state court order and the Seventh Circuit affirmed on grounds that such action was "necessary to effectuate the earlier order of the federal court and thus not in contravention of 28 U.S.C. § 2283." Id. at 1204. See also Henry v. First National Bank of Clarksdale, 595 F.2d 291, 306-07 (5th Cir. 1979), cert. denied sub nom. Claiborne Hardware Co. v. Henry, 444 U.S. 1074, 100 S.Ct. 1020, 62 L.Ed.2d 756 (1980); Thomason v. Cooper, 254 F.2d 808 (8th Cir. 1958); Baker v. Gotz, 415 F.Supp. 1243 (D.Del.), aff'd mem., 546 F.2d 415 (3d Cir. 1976). Thus the district court plainly acted within its authority in enjoining the WSSC from complying with the June 17 order of the Circuit Court for Prince George's County.
 
 
 28
 The State of Maryland, while acknowledging the power of the district court to stay the Prince George's Circuit Court injunction, joins appellant in arguing that the June 27 order was overly broad in enjoining both pending state proceedings which had not progressed to final judgment and prospective state litigation concerning Site 2. The law is clear, however, that a federal court is not required to await a final judgment by a state court before acting to protect its own decrees.[18]
 
 
 29
 Where proceedings in a federal court have been ongoing for several years, as they have here, state proceedings which would frustrate the federal court's effective disposition of the case have frequently been enjoined even where the state proceedings have not yet progressed to final judgment. Many of these cases have involved school desegregation orders. See Swann v. Charlotte-Mecklenburg Board of Education, 501 F.2d 383 (4th Cir. 1974); Grenchik v. Mandel, 373 F.Supp. 1298 (D.Md.1973).[19] In New York State Association for Retarded Children, Inc. v. Carey, 456 F.Supp. 85 (E.D.N.Y.1978), the district court enjoined a state proceeding which would have interfered with its disposition of a civil rights case over which it had acquired jurisdiction five years earlier, noting that the state court plaintiffs' claims would properly have been brought before the federal court. Id. at 97. In this case, too, we believe that if P. G. County believed changed circumstances required modification of the 1978 order, it was obligated to seek such modification in the district court, which ordered the implementation of Site 2 in 1978.
 
 
 30
 Thus we conclude that it was within the district court's discretion to enjoin P. G. County's participation in the three pending proceedings in Maryland state courts in which the relief sought would have frustrated the district court's "flexibility and authority" to enforce its 1978 order. The injunction against prospective state court litigation concerning Site 2, being outside the scope of § 2283,[20] is likewise valid. In sum, we find no violation of the Anti-Injunction Act or of equitable principles in the June 27 injunction order.
 
 III. CONCLUSION
 
 31
 We find that neither the tenth amendment nor the Anti-Injunction Act was violated by the three district court orders challenged here. We also find appellant's other arguments, that evidentiary hearings were required before issuance of the orders and that the June 27 injunction was unwarranted under traditional equitable criteria, without merit. We believe that the actions taken by the district court were necessary to effectuate its 1978 order and to ensure the long overdue implementation of a regional sludge management plan. Accordingly, the judgment of the district court is
 
 
 32
 Affirmed.
 
 
 
 [1]
 The WSSC is an agency formed under the laws of Maryland to serve the sewage and water supply needs of Montgomery and Prince George's Counties. The Commission's policies are determined by six Commissioners, three from each county. See Section 1-1 of the WSSC Code. Budgets adopted by the WSSC are subject to the approval of both county governments. Sections 1-4, 7-1
 
 
 [2]
 Sludge is the byproduct of the sewage treatment process. Disposal methods include entrenchment in designated areas and the composting process for which Site 2 was designated. The end product of composting may be used as a fertilizer or compost. The 1974 agreement contemplated that the Blue Plains plant would generate 2,400 tons per day of sludge requiring disposal. Joint Appendix at 108
 
 
 [3]
 The District of Columbia appealed that portion of the July 10 order requiring it to construct a compost facility at the Blue Plains plant. This court affirmed the contested portion of the order in an unpublished opinion. State Water Control Bd. v. Washington Suburban Sanitary Commission, 600 F.2d 281 (D.C.Cir.1979)
 
 
 [4]
 Prince George's County v. WSSC, No. E-7692 (Circuit Court for Prince George's County, Maryland, filed Nov. 27, 1979)
 
 
 [5]
 The covenants preclude use of the land in any manner which would create objectionable odors, generate dense smoke or high levels of noise, or constitute a "dump or sanitary landfill." P. G. County argued that because the covenants run not only to owners of adjacent properties but also to property owners "in the general neighborhood," a lengthy judicial determination of the composition of the protected class would be required
 
 
 [6]
 On November 19, 1980, a motions panel of this court summarily affirmed that portion of the June 4 order which declined to hold the P. G. Commissioners in contempt. See United States v. District of Columbia, No. 80-1495 (D.C.Cir. Nov. 19, 1980) (per curiam order)
 
 
 [7]
 Calverton County Association v. Buck, No. E-70934 (Circuit Court for Montgomery County, Maryland, filed April 16, 1980)
 
 
 [8]
 Prince George's County v. WSSC, No. E-8512 (Circuit Court for Prince George's County, Maryland, filed April 16, 1980)
 
 
 [9]
 The lower courts have limited National League of Cities to legislation which is based on the commerce clause. Thus the Second Circuit has held that the Federal Railway Labor Act, which permits strikes by railroad employees, must yield under Usery to a state statute barring strikes by public employees, see United Transportation Union v. Long Island Rail Road Co., 634 F.2d 19 (2d Cir. 1980), and the Sixth Circuit has held that employees of a municipal airport were not covered by the Fair Labor Standards Act because operation of the airport was an integral function of city government, see Amersbach v. City of Cleveland, 598 F.2d 1033 (6th Cir. 1979). Compare State of New Hampshire v. Marshall, 616 F.2d 240 (1st Cir.), appeal dismissed, 449 U.S. 806, 101 S.Ct. 53, 66 L.Ed.2d 10 (1980) (rejecting tenth amendment challenge to amendments to Federal Unemployment Tax Act extending benefits to state employees on grounds that statute was enacted under spending power, not commerce power); Cantwell v. County of San Mateo, 631 F.2d 631 (9th Cir. 1980), cert. denied, --- U.S. ----, 101 S.Ct. 1703, 68 L.Ed.2d 199 (1981) (holding federal statute governing retirement pay for reserve military personnel must prevail over state statute, despite Usery, because federal statute enacted under Congressional war power); Usery v. Charleston County School District, 558 F.2d 1169 (4th Cir. 1977); and Usery v. Allegheny County Institution District, 544 F.2d 148 (3d Cir. 1976), cert. denied sub nom. Allegheny County Institution District v. Marshall, 430 U.S. 946, 97 S.Ct. 1582, 51 L.Ed.2d 793 (1977) (rejecting tenth amendment challenges to application of Equal Pay Act to state and local governments on grounds Act was exercise of Congressional power under Fourteenth Amendment)
 
 
 [10]
 In Illinois v. City of Milwaukee, 406 U.S. 91, 92 S.Ct. 1385, 31 L.Ed.2d 712 (1972), the Court, in an opinion recognizing the existence of a federal common law concerning interstate water pollution, stated:
 The Federal Water Pollution Control Act in § 1(b) declares that it is federal policy "to recognize, preserve, and protect the primary responsibilities and rights of the States in preventing and controlling water pollution." But the Act makes clear that it is federal, not state, law that in the end controls the pollution of interstate or navigable waters.
 Id. at 102, 92 S.Ct. at 1392 (footnote omitted). Subsequent to the Court's decision in Illinois v. City of Milwaukee, Congress expanded federal statutory control over water pollution by enacting the Federal Water Pollution Control Act Amendments of 1972. The Court has recently held that those amendments were so comprehensive as to preempt federal common law in that area. See City of Milwaukee v. Illinois, --- U.S. ----, 101 S.Ct. 1784, 68 L.Ed.2d 114 (1981).
 
 
 [11]
 At issue in District of Columbia v. Train was an EPA transportation control plan under the Clean Air Act for the National Capital Region. This court affirmed the regulations in part but struck down a portion of the plan which required area jurisdictions to adopt automobile inspection and maintenance programs and to retrofit certain vehicles with pollution control devices. The court held that that portion of the regulations, by substituting compelled state regulation for permissible federal regulation, exceeded the scope of the commerce power, 521 F.2d at 992, and was such a "drastic" invasion of state sovereignty as to violate the tenth amendment, id. at 994. Appellant invokes Train to argue that the district court orders in this case are likewise an impermissibly "drastic" invasion of state sovereignty. We find the analogy unpersuasive. The Train court emphasized that the regulations invalidated there forced "unconsenting" states to administer and enforce a federal program. Id. at 992. In this case, however, appellant, along with other area jurisdictions, entered into a consent decree and agreed that the district court should retain power to enforce it. In addition, the nature of state action required by the district court in this case is significantly less intrusive on state sovereignty than the ongoing state regulatory program invalidated in Train
 
 
 [12]
 Atlantic Coast Line Railroad Co. v. Brotherhood of Locomotive Engineers, 398 U.S. 281, 287, 90 S.Ct. 1739, 1743, 26 L.Ed.2d 234 (1970)
 
 
 [13]
 Mitchum v. Foster, 407 U.S. 225, 233, 92 S.Ct. 2151, 2157, 32 L.Ed.2d 705 (1972), quoting Oklahoma Packing Co. v. Oklahoma Gas & Electric Co., 309 U.S. 4, 9, 60 S.Ct. 215, 218, 84 L.Ed. 447 (1939)
 
 
 [14]
 7 Moore's Federal Practice P 60.39(2), at 657 (2d ed. 1979)
 
 
 [15]
 Vendo Co. v. Lektro-Vend Corp., 433 U.S. 623, 630, 97 S.Ct. 2881, 2887, 53 L.Ed.2d 1009 (1977). The United States has argued before this court that the Act does not apply where, as here, one of the litigants seeking to enjoin state proceedings is the federal government. The Supreme Court so held in two cases, reasoning that the policy behind the Act is far less compelling where a stay is sought to protect "superior federal interests." See National Labor Relations Bd. v. Nash-Finch Co., 404 U.S. 138, 146, 92 S.Ct. 373, 378, 30 L.Ed.2d 328 (1971); Leiter Minerals, Inc. v. United States, 352 U.S. 220, 226, 77 S.Ct. 287, 291, 1 L.Ed.2d 267 (1957). The status of this implied exception is left unclear in other decisions of the Court which stress that the three specific statutory exceptions are exclusive and "should not be enlarged by loose statutory construction." Atlantic Coast Line Railroad Co. v. Brotherhood of Locomotive Engineers, 398 U.S. 281, 287, 90 S.Ct. 1739, 1743, 26 L.Ed.2d 234 (1970). Because this issue is raised for the first time on appeal and because its resolution is unnecessary to our disposition of this case, we express no view on whether the participation of the federal government in this case renders § 2283 inapplicable
 
 
 [16]
 The district court also adverted to, and the appellees secondarily rely on, the second exception, which permits an injunction "in aid of" the federal court's jurisdiction. The Reviser's Note to § 2283 states that the "in aid of" language was intended "to conform to section 1651 of this title (the All Writs Act, 28 U.S.C. § 1651) and to make clear the recognized power of the Federal courts to stay proceedings in state cases removed to the district courts." The "in aid of" exception has also been construed to allow a federal court to protect its prior jurisdiction over a res by enjoining a state proceeding that interferes therewith. 1A Moore's Federal Practice P 0.225, at 2617 (2d ed. 1981); 17 Wright, Miller & Cooper, Federal Practice and Procedure § 4225 (1978). Professor Wright has suggested that the "in aid of" exception also encompasses cases "where a district court has taken a controversy in hand and will exercise continuing jurisdiction," id., reasoning that state court intervention in such a controversy would seriously impair the power of the district court to decide the case, and citing Swann v. Charlotte-Mecklenburg Board of Education, 501 F.2d 383 (4th Cir. 1974), and Grenchik v. Mandel, 373 F.Supp. 1298 (D.Md.1973). Because the Supreme Court has indicated that there is some overlap between the "protect or effectuate" and "in aid of" exceptions, see Atlantic Coast Line Railroad Co. v. Brotherhood of Locomotive Engineers, 398 U.S. 281, 295, 90 S.Ct. 1739, 1747, 26 L.Ed.2d 234 (1970), we believe that either of the exceptions provides ample justification for the June 27 order
 
 
 [17]
 Reviser's Note to 28 U.S.C. § 2283. The exception was intended to overrule Toucey v. New York Life Insurance Co., 314 U.S. 118, 62 S.Ct. 139, 86 L.Ed. 100 (1941), in which the Supreme Court had held that federal courts lacked the power to enjoin relitigation in state court of controversies adjudicated in federal court
 
 
 [18]
 In Brown v. O'Brien, 469 F.2d 563 (D.C.Cir.), vacated as moot, 409 U.S. 816, 93 S.Ct. 67, 34 L.Ed.2d 72 (1972), the Credentials Committee of the Democratic Party had ruled that challenged delegates from Illinois should be unseated and replaced. The unseated delegates challenged this action in suits filed in both state and federal court. In the federal suit, the defendant Democratic Party filed a counterclaim, seeking to enjoin prosecution of the state court action. The district court upheld the action of the Credentials Committee but denied an injunction. This court affirmed the judgment dismissing the complaint but remanded for an injunction against the state court proceeding, finding that an injunction was necessary to prevent the state court from "taking any action in any other court that would impair the effectiveness and the integrity of the judgments of this Court." 469 F.2d at 574. See also Donelon v. New Orleans Terminal Co., 474 F.2d 1108 (5th Cir.), cert. denied, 414 U.S. 855, 94 S.Ct. 157, 38 L.Ed.2d 105 (1973)
 
 
 [19]
 Appellant argues that the foregoing cases are distinguishable because they involve protection of individual constitutional rights, as to which the federal injunctive power is singularly broad. Whatever the validity of this suggestion as a general proposition, it has no relevance in the context of § 2283, which allows a federal court to enjoin state proceedings in order to "protect or effectuate" its judgments in any type of proceeding. See Samuel C. Ennis & Co. v. Woodmar Realty Co., 542 F.2d 45 (7th Cir. 1976), cert. denied, 429 U.S. 1096, 97 S.Ct. 1112, 51 L.Ed.2d 543 (1977) (action in state court against trustee in bankruptcy enjoined by federal court which had conducted bankruptcy proceeding years earlier); Baker v. Gotz, 415 F.Supp. 1243 (D.Del.), aff'd mem., 546 F.2d 415 (3d Cir. 1976) (enjoining state court sequestration of notes which conflicted with prior district court determination that sequestration was not an available remedy)
 
 
 [20]
 Section 2283 bars injunctions only of existing state court proceedings and has no application before such proceedings have begun. In a case where equitable principles warrant relief, a party may be enjoined from instituting proceedings in a state court. 1A Moore's Federal Practice P 0.208(3.-1), at 2316 (2d ed. 1981); 17 Wright, Miller & Cooper, Federal Practice and Procedure § 4222 (1978)